# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

KEITH BYRON BARANSKI,                    )
                                         )
            Petitioner,                  )
                                         )
      v.                                 )          No. 4:11-CV-123 CAS
                                         )
UNITED STATES OF AMERICA,                )
                                         )
            Respondent.                  )

## MEMORANDUM AND ORDER

This matter is before the Court on petitioner Keith Byron Baranski's Third Amended Verified Petition for Writ of Error Coram Nobis and respondent United States of America's motion for summary judgment. The Court held an evidentiary hearing in this matter on December 7 and 8, 2015. After the hearing transcript was prepared, the Court ordered the parties to submit proposed findings of fact and conclusions of law for its consideration, and provided them an opportunity to file responses. This matter is now ready for decision. The Court makes the following findings of fact and conclusions of law, and ultimately concludes petitioner has failed to establish that he is entitled to the extraordinary relief of a writ of coram nobis.

## I. Background

Mr. Baranski was convicted of one count of conspiracy to import machine guns illegally by submitting false entries in forms submitted to the Bureau of Alcohol, Tobacco & Firearms ("ATF"), in violation of 18 U.S.C. § 371. The government sought and obtained criminal forfeiture of the weapons. Mr. Baranski was sentenced to a term of sixty months' imprisonment followed by three years supervised release. Mr. Baranski appealed his conviction and sentence and the Eighth Circuit Court of Appeals affirmed. United States v. Baranski, 75 F. App'x 566 (8th Cir. 2003) (unpublished

per curiam).  Mr. Baranski filed a motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255, which this Court denied.  Baranski v. United States, 2006 WL 472451 (E.D. Mo. Feb. 27, 2006).  Mr. Baranski appealed the denial of his § 2255 motion and the Eighth Circuit affirmed.  Baranski v. United States, 515 F.3d 857 (8th Cir. 2008).

Mr. Baranski's term of supervised release terminated on August 17, 2009.  Mr. Baranski filed a pro se Petition for Writ of Error Coram Nobis on January 18, 2011, and an amended petition through counsel on March 14, 2011 that asserted three counts.  Mr. Baranski filed a second Amended Petition for Writ of Error Coram Nobis on May 21, 2014 that asserted ten counts (Doc. 140).[1]  The government moved to dismiss the Second Amended Petition as abuse of the writ.  The Court granted the government's motion to dismiss as to five counts and denied it as to five counts.[2] See Mem. and Order of Oct. 7, 2014 (Docs. 177, 181.)  The Court also granted Mr. Baranski's motion for leave to file a third amended petition for writ of error coram nobis, directing him to omit from his amended petition those claims that the Court held constituted abuse of the writ or were second or successive.  (Id.)

Petitioner filed a Third Verified Amended Petition for Writ of Error Coram Nobis ("Petition") that asserts the following counts:

> I. The Government Promised Witness James Carmi a Further Reduction in His Sentence Under Rule 35(b), Federal Rules of Criminal Procedure, but Deliberately Withheld that Information at Baranski's Trial.

---

[1]This matter was originally set for evidentiary hearing in December 2011.  (Doc. 27.) Between October 2011 and January 2014, Mr. Baranski filed seven motions for continuance of the hearing.  (Docs. 30, 39, 83, 88, 110, 115 and 123.)

[2]As discussed more fully *infra*, the Court also dismissed the portion of petitioner's tenth count that related to the other dismissed counts.

II. The Government Was Fully Aware of the Extent of Witness James Carmi's Memory Impairment and Deliberately Withheld Records Supporting Carmi's Amnesia and Memory Loss.

III. The Government Misled the Court and Baranski's Defense Team about the Extent and Length of Witness James Carmi's Incarceration Exposure.

IV. The Government Deliberately Withheld Information About Favors Offered to and/or Requested by Witness James Carmi.

V. Prosecutorial misconduct and vindictive prosecution, based on the foregoing.

(Doc. 187.)

The government filed a motion for summary judgment on August 17, 2015. The government's summary judgment motion asserts that (1) the facts do not support any of Mr. Baranski's counts, and (2) Mr. Baranski has failed to show a fundamental constitutional error that merits the extraordinary remedy of coram nobis. Summary judgment briefing was completed on November 20, 2015. On November 30, 2015, the Court denied petitioner's motion for leave to file a surresponse in opposition to the government's summary judgment motion (Doc. 277).

The Court held a prehearing conference on December 3, 2015. Among other things, the Court stated it would take the government's summary judgment motion with the evidentiary hearing. The Court also addressed Mr. Baranski's Motion for Relief Under Rule 32(a)(4), Fed. R. Civ. P., which sought permission to use the complete depositions of petitioner's witnesses William Brown, John Rogers and Scott Rosenblum at the evidentiary hearing in lieu of their live testimony. The Court granted the motion as to witness Brown, who was recovering from surgeries and hospital stays for a failed hip replacement. As to attorneys Rogers and Rosenblum, Mr. Baranski stated they would be out of town in trial and asserted this met the "exceptional circumstances" requirement of Rule 32(a)(4)(E). The Court expressed concern at these witnesses' potential absence from the

hearing because "it might need to rule on [their] credibility," and asked Mr. Baranski's counsel several times whether he considered issuing subpoenas to Rogers and Rosenblum.  (See Tr. of Prehearing Conf. at 2, 5, 6-7, 8, 36, Doc. 289).[3]

On the morning of the evidentiary hearing, Mr. Baranski's counsel stated he had issued subpoenas to Rogers and Rosenblum, but had also learned additional details about the serious nature of the state court criminal case Rogers was defending, which he described on the record.  The Court then found that Rogers' absence was due to an exceptional circumstance under Rule 32(a)(4)(E) and granted petitioner's motion to introduce his deposition in lieu of live testimony.  Mr. Baranski's attorney stated that although he issued a subpoena to Rosenblum, Rosenblum's testimony would be submitted through his deposition.  (Tr. Vol. I at 153-54.)  Mr. Baranski did not request that the subpoenas be enforced or seek a continuance of the evidentiary hearing so that Rogers or Rosenblum could be present to offer live testimony.

The evidentiary hearing lasted two days.  After the hearing transcript was prepared, the parties filed proposed findings of fact and conclusions of law.  As part of his proposed findings and conclusions, Mr. Baranski withdrew his claims in Count IV of the Third Amended Verified Petition, that the government deliberately withheld information about favors offered to and/or requested by James Carmi.  See Pet.'s Proposed Findings of Fact and Conclusions of Law at 3, ¶ 6.  The Court therefore does not address Count IV.

---

[3]At the conclusion of the prehearing conference, the Court said to Mr. Baranski's counsel, "[T]his whole thing, I mean, you know, as far as these unavailable witnesses.  And for me to deal with Rogers in terms of credibility, it probably would be good for him to be here, but if you don't subpoena him, then he's not here, and I can't – then that's that."  (Tr. of Prehearing Conf. at 37.)

## II. Legal Standard

A writ of coram nobis is an "extraordinary remedy," and courts should grant the writ "only under circumstances compelling such action to achieve justice," <u>United States v. Morgan</u>, 346 U.S. 502, 511 (1954), and to correct errors "of the most fundamental character." <u>Id.</u> at 512 (quoted case omitted). "[J]udgment finality is not to be lightly cast aside; courts must be cautious so that the extraordinary remedy of *coram nobis* issues only in extreme cases." <u>United States v. Denedo</u>, 556 U.S. 904, 916 (2009).

The burden is on the petitioner to show that he is entitled to coram nobis relief on the merits of his claim. <u>Willis v. United States</u>, 654 F.2d 23, 24 (8th Cir. 1981). "[A] petitioner must show a compelling basis before coram nobis relief will be granted, <u>see</u> <u>Kandiel v. United States</u>, 964 F.2d 794, 797 (8th Cir. 1992), and the movant 'must articulate the fundamental errors and compelling circumstances for relief in the application for coram nobis.' <u>Id.</u>" <u>United States v. Camacho-Bordes</u>, 94 F.3d 1168, 1172-73 (8th Cir. 1996). To be entitled to coram nobis relief, a petitioner must also demonstrate that he is suffering from adverse collateral consequences due to the allegedly wrongful conviction. <u>Stewart v. United States</u>, 446 F.2d 42, 43-44 (8th Cir. 1971).

## III. Findings of Fact

A. <u>Summary of the Witnesses Who Testified</u>

1. Mr. Richard Gardiner ("Gardiner") represented Mr. Baranski during his criminal trial, his direct appeal to the Eighth Circuit, his petition pursuant to 28 U.S.C. § 2255, and the appeal thereof. (Evidentiary Hearing Transcript ("Tr.") Vol. I, 15-90; 16:1-21.)

2. Mr. Robert E. Sanders ("Sanders") also represented Mr. Baranski during his criminal trial at issue in this case, but his representation of Mr. Baranski ended after the jury verdict. (Tr. Vol. I, 91-118; 105:9-14.)

3. Petitioner Baranski testified at the evidentiary hearing. Mr. Baranski was charged with conspiracy to import, receive and possess machine guns by making and submitting false entries on records submitted to ATF knowing such entries to be false. (See <u>United States v. Baranski</u>, No. 4:02-CR-361 CAS (E.D. Mo.)). Starting on November 12, 2002 and ending on November 18, 2002, Mr. Baranski was tried before a jury and was found guilty. (See Trial Transcript. Vols. I–V, No. 4:02-CR-361 CAS ("Trial Tr.")) At the evidentiary hearing, the Court also admitted Mr. Baranski's deposition pursuant to Rule 32(a)(3). (See Baranski Dep., Gov't Ex. D.)

4. Mr. John Rogers ("Rogers") testified via deposition transcript at the evidentiary hearing. Rogers represented Carmi concerning a federal firearms investigation and a criminal conviction that was prior to Mr. Baranski's trial and related to the federal criminal case against Mr. Baranski. (See Gov't Ex. O; Tr. Vol. I, 190-198.)

5. William J. Ekiss ("Ekiss") is a criminal defense attorney and was retained by Mr. Baranski when Mr. Baranski was under investigation by the ATF and the United States Attorney's Office in the Eastern District regarding a weapons violation. (Tr. Vol. II, 5-17.)[4]

6. Mr. Scott Rosenblum ("Rosenblum") testified via deposition transcript. (See Gov't Ex. P; Tr. Vol II, 18-31.) Rosenblum represented Carmi after he was arrested for possession of a firearm. (Tr. Vol. II, 32:20-21.)

7. Carmi testified at Mr. Baranski's criminal trial in November 2002 as a co-conspirator with Mr. Baranski and also testified at the evidentiary hearing in this matter. (Tr. Vol. II, 31-79.)

---

[4]The second volume of the evidentiary hearing transcript does not contain line numbers. The Court has indicated the lines on which the relevant testimony appears, as determined by manual counting of the lines. Every effort has been made to accurately reflect the location of the testimony, but errors may have occurred nonetheless as to specific line citations.

8.  Former Assistant United States Attorney Richard Poehling ("AUSA Poehling") was employed with the USAO from 1979 through 2011.  (Tr. Vol. II, 81:21-82:3.)  AUSA Poehling was the supervisor of the Violent Crime Unit of the USAO in 2000.  (Tr. Vol. II, 82:23-83:4.)  AUSA Poehling handled the case against Carmi and Mr. Baranski while he was the head of the Violent Crime Unit.  (Tr. Vol. II, 82-83.)   AUSA Poehling testified about his involvement with the prosecution of Carmi and Mr. Baranski in 2000 before he recused himself from the case.  (Tr. Vol. II, 81-143.)  Pursuant to Mr. Baranski's request, the entire deposition of AUSA Poehling was received into evidence.  (Poehling Dep., Pet.'s Ex. 120.)

9.  Agent Michael Johnson ("Agent Johnson") is a supervisory special agent with ATF and testified about his involvement in the investigation of Carmi and Mr. Baranski.  (Tr. Vol. II, 143-163.)  Pursuant to Mr. Baranski's request, the entire deposition of Agent Johnson was received into evidence.  (Johnson Dep., Pet.'s Ex. 117.)

10.  Former Assistant United States Attorney James Martin ("AUSA Martin") testified about his involvement with the prosecution of Mr. Baranski starting in April 2002 after AUSA Poehling was recused from the case.  (Tr. Vol. II, 165-195.)  AUSA Martin worked for the USAO for over 20 years and held the positions of Assistant United States Attorney, Executive Assistant United States Attorney, and United States Attorney.  (Tr. Vol. II, 165.)  Pursuant to Mr. Baranski's request, the entire deposition of AUSA Martin was received into evidence.  (Martin Dep., Pet.'s Ex. 119.)

B.  James Carmi's Relevant Criminal Proceedings

11.  On October 17, 2000, the Government initiated criminal proceedings against Carmi based on a referral by ATF.  Carmi was charged in a Complaint with being a convicted felon in possession of a firearm, specifically a Class III machine gun.  (United States v. Carmi, No. 4:01-CR-91 ERW (E.D. Mo.), Doc. 1; Tr. Vol. II, 83:9-16.)

12.  When Carmi was arrested, a federal search warrant was obtained to search his property. (Tr. Vol. II, 84:12-15.)  The search warrant revealed a weapons vault with 800 or so fully automatic weapons and numerous other types of armaments.  (Tr. Vol. II, 149:5-8.)

13.  When Carmi was first arrested, AUSA Poehling and Carmi's attorney, Rosenblum, petitioned the Court for Carmi to be medically and psychologically examined by the Bureau of Prisons at the Springfield Federal Medical Center for a competency evaluation.  (Tr. Vol. II, 33:16-20.)  At that evaluation, Dr. Robert L. Denny ("Dr. Denny"), who is board certified in neuropsychology and forensic psychology, determined that Carmi was malingering with respect to his claimed mental condition.  (Springfield Forensic Report, Gov't Ex. E.)  A report was prepared by the Springfield Federal Medical Center which extensively detailed Carmi's medical and mental health, history, and conditions.  (Id.)

14.  On February 28, 2001, Carmi was indicted by a federal Grand Jury in this district on one count of being a prior convicted felon in possession of a firearm (a Heckler & Koch MP5 submachine gun equipped with a silencer) in violation of 18 U.S.C. § 922(g)(1).  (United States v. Carmi, No. 4:01-CR-91 ERW, Doc. 29.)

15.  During the course of AUSA Poehling's investigation of the Carmi matter and preparation of the case for trial, it appeared to AUSA Poehling that some other people were involved with criminal activity as well as Carmi.  (Tr. Vol. II, 87:21-25.)

16.  Jeffrey Knipp ("Knipp") was the Chief of Police of Farber, Missouri, a town of 300-400 people.  (Trial Tr. Vol. III, 42.)  Knipp prepared letters requesting demonstration of certain firearms "for evaluation by his department's tactical unit," which were false because Knipp did not care to see a demonstration of firearms and did not have a tactical unit, but rather wanted to obtain free guns.  (Trial Tr. Vol. III, 47-48; Tr. Vol. II, 88:4-15.)  Knipp pleaded guilty to knowingly making

a false entry on ATF Forms 6 and testified for the Government at Mr. Baranski's criminal trial. (Trial Tr. Vol. III, 42-64.)

17. AUSA Poehling testified that he believed Mr. Baranski was involved in the importation of large capacity gun magazines, which were illegal to possess at the time, and which would work in machine guns. AUSA Poehling wanted to investigate Mr. Baranski's possible criminal actitivies further and wanted to obtain Carmi's cooperation against Mr. Baranski and Knipp, which included testifying on behalf of the Government. (Tr. Vol. II, 88:16-22, 90:23-91:18, 140:18-41:4.)

18. AUSA Poehling set up proffer meetings with Carmi which were attended by ATF agents, Carmi's counsel, and on three occasions by AUSA Poehling. (Tr. Vol. II, 89:1-90:22; Gov't Exs. S, T, U, V; Poehling Dep., Pet.'s Ex. 120, 11:23-12:16.)

19. On August 31, 2001, Carmi pleaded guilty to a superseding information which amended the charges from the original indictment. (United States v. Carmi, No. 4:01-CR-91 ERW, Docs. 56-58; Tr. Vol. II, 92:15-25, 104:12-15.)

20. AUSA Poehling amended the charges because of the cooperation Carmi provided and to aid in the prosecution of Mr. Baranski and Knipp, because it was the course of conduct that overlapped between Carmi and Mr. Baranski in criminal activity. (Tr. Vol II, 104:18-105:2.)

21. Carmi entered a plea of guilty to Counts 1 and 2 of the superseding information which included violations of 18 U.S.C. §§ 2 and 956(a)(1(a)(i), concerning money laundering, and 26 U.S.C. § 5861(1), concerning false entries on applications and permits for importation of firearms. In exchange, the Government agreed to move for the dismissal of the original indictment at the time of sentencing, and agreed that no further federal prosecution would be brought in this district relative to Carmi's acquisition and distribution of firearms of which the government was aware. (Tr. Vol.

II, 96:8-25; Stipulation of Facts Relevant to Sentencing ("Plea Agreement"), Gov't Ex. C; United States v. Carmi, No. 4:01-CR-91 ERW, Docs. 56-58.)

22. In addition, the Plea Agreement states in part, "Defendant [Carmi] has entered into an agreement with the Government in which the Defendant [Carmi] has offered to assist the Government. The Defendant [Carmi] has provided assistance to the Government in its ongoing firearms investigation. The Government, at or near the time of sentencing, agrees to file a motion for downward departure under Section 5K1.1 of the Guidelines." (Plea Agreement, Gov't Ex. C; Tr. Vol. II, 97:19-25.)

23. Paragraph 13 of the Plea Agreement states that the agreement is the entire agreement between the Government and Carmi, as follows:

> This agreement constitutes the entire agreement between the defendant and the United States, and no other promises, or inducements have been made, directly or indirectly, by any agent of the United States, including any Department of Justice attorney, concerning any plea to be entered in this case, or the stipulations, agreements, or recommendations found herein.
>
> In addition, the defendant states that no person has, directly or indirectly, threatened or coerced him to do or to refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

(Tr. Vol. II, 109:1-11; Plea Agreement, Gov't Ex C.)

24. AUSA Poehling testified that the Government did not make any other promises to Carmi and did not have any other agreements to get Carmi to enter the plea, and anything that was promised to Carmi was included in the Plea Agreement. (Tr. Vol. II, 109:16-110:1.)

25. According to AUSA Poehling, the Government agreed to file and did file a motion pursuant to United States Sentencing Guidelines § 5K1.1 for a reduction in Carmi's sentence "[b]ecause of the cooperation he provided in the investigation of Keith Baranski, which basically consisted of providing intelligence information that the government previously was not aware of

concerning Mr. Baranski's activities, appearance and providing testimony at the Federal Grand Jury regarding the Baranski matter and testimony at trial regarding the Baranski - - regarding what he had provided in conjunction with Mr. Baranski."  (Poehling Dep., Pet.'s Ex. 120, 39:14-40:5; Motion for Downward Departure for Carmi, Gov't Ex. TT; Tr. Vol. II, 122:18-123:25.)

26.  AUSA Poehling testified it was understood that Carmi would provide full cooperation regarding the investigation of Mr. Baranski which included testifying at Mr. Baranski's trial if asked to do so.  (Tr. Vol. II, 140:18-41:18.)

27.  Carmi's former attorney Rosenblum testified that Carmi's Presentence Investigation Report ("PSR") was "captured in the plea agreement, and I think in almost every plea agreement it contemplates continuing cooperation. . . . It contemplates continuing cooperation as to a particular case that he's receiving a reduction.  . . .   [W]hen you receive a 5K1, it contemplates that the individual is agreeing to cooperate, and the cooperation will be continuing vis-a-vis that case."  (Rosenblum Dep., Gov't Ex. P, 41:17-42:4.)

28.  AUSA Poehling testified that another way a federal prosecutor could ask a court to reduce a sentence is under Federal Rule of Criminal Procedure 35, which he stated allows the Government to file a motion advising the Court that the defendant has provided newly discovered evidence, and as a result the Government is asking the Court to consider reducing the originally imposed sentence.  (Tr. Vol. II, 98:15-99:13.)

29.  AUSA Poehling testified that if there had been a Government promise to file a Rule 35 for Carmi, it would have been included in the Plea Agreement because that would have been an inducement to get Carmi to plead guilty.  (Tr. Vol. II, 110:4-12.)

30.  AUSA Poehling testified that the difference between a Rule 35 motion and a 5K1.1 motion is that a 5K1.1 does not have any time parameters on it in terms of how old the information

can be, but a Rule 35 requires that the information be newly discovered. (Tr. Vol. II, 99:4-10.) AUSA Martin also testified that the Government could file a Rule 35 motion "within one year from the date of an individual's sentencing, if they provide additional cooperation – and I think the cooperation had to be something new[.]" (Tr. Vol II, 175:11-19.)

31. Rosenblum also testified that if Carmi got a 5K1 reduction it would not be typical in this district or in any district for him to get a Rule 35 reduction for the same information and testimony. (Rosenblum Dep., Gov't Ex. P, 42:8-12.)

32. AUSA Poehling testified the Government did not agree to file a reduction of sentence under Rule 35 on behalf of Carmi for his cooperation or testimony against Mr. Baranski because Rule 35 did not apply in his case. (Tr. Vol. II, 99:11-13.)

33. On August 31, 2001, Carmi appeared and testified under oath at a change of plea hearing. (Carmi Change of Plea Transcript ("Plea Tr."), Case No. 4:01-CR-91 ERW, Gov't Ex. I). AUSA Poehling and Rogers attended the hearing. (Id., 1.)

34. Judge Webber formally found Carmi to be guilty, found that Carmi was competent and capable of entering an informed plea, and accepted the plea. (Plea Tr., 28.)

35. Carmi testified at the guilty plea hearing that there were no other agreements or understandings or deals that existed which would affect his case in any way. (Plea Tr., 19:15-19.)

36. Carmi also testified at the guilty plea hearing that, other than the Plea Agreement, no one had made any other or different promises, representations or assurances to induce his plea of guilty. (Plea Tr., 19:23-20:2.)

37. There was no mention of a Rule 35 in the Plea Agreement or at the plea hearing. (Tr. Vol. II, 99:17-24, 115:5-7; Plea Agreement, Gov't Ex. C; Plea Tr., Gov't Ex. I.)

38. On November 8, 2001, the Court granted the Government's motion pursuant to U.S.S.G. § 5K1.1 and departed downward from the Sentencing Guidelines range. Carmi was sentenced by Judge Webber to 42 months imprisonment. (Carmi Sent. Tr., Gov't Ex. Q.) There is no reference in the sentencing transcript to an agreement or promise by the Government to file a Rule 35 motion for a further reduction of Carmi's sentence. (Id.).

39. At Carmi's sentencing, Judge Webber stated in part, "Mr. Poehling has filed, with your attorney's knowledge, a 5K1.1 motion, which will permit me to sentence you at something less than the United States sentencing guidelines. We have conducted a rather intensive conference in chambers and I'm convinced that based upon your unusual efforts in this case, that I should sentence you at substantially less under the 5K1.1 motion than I customarily would do. In this case, it's my intention to sentence you at 42 months." (Id., 7:18-16.)

40. Judge Webber also stated, "[I]t's been represented to me that depending upon certain circumstances that happen hereafter, which you and counsel can discuss, that there's a likelihood that a further reduction at some time in the future, depending upon your continued cooperation, may occur." (Id., 7:17-21.)

41. Gardiner testified that Judge Webber's statement concerning a further reduction did not specifically mention Mr. Baranski's prosecution, or Rule 35, or any agreement or promise by the Government to do anything in the future. (Tr. Vol. I, 86:9-18.)

42. AUSA Martin testified that although the cooperation agreement was reached between AUSA Poehling and Carmi's attorneys before Martin became involved in the case, Carmi got the benefit of the 5K1.1 motion before Mr. Baranski's trial and before his cooperation for the 5K1.1 was completed. (Tr. Vol. II, 169:3-10.)

13

43.	AUSA Poehling testified that when Judge Webber made the statement at Carmi's sentencing about the likelihood of a further reduction, Judge Webber had to be referring to additional cooperation which Carmi proffered beyond the Baranski matter. AUSA Poehling testified that evidence Carmi had provided regarding Mr. Baranski would not have been newly discovered and therefore would not have been eligible for a further reduction. (Tr. Vol. II, 128:8-129:7.)

44.	AUSA Poehling testified that instead, such additional cooperation would have involved other subjects or other criminal activity that Carmi was aware of unrelated to Mr. Baranski. (Tr. Vol. II, 129:2-7.)

45.	AUSA Poehling testified in his deposition that he was unaware of Carmi proffering anything unrelated to Mr. Baranski that would have merited a Rule 35 consideration, but "that possibility existed if he came up with something new[.]" (Poehling Dep., Pet.'s Ex. 120, 27:11-12.)

C.	Count I – There Was No Promise of a Rule 35 Sentence Reduction to Carmi

46.	Carmi never received a Rule 35 sentence reduction from the Government. (Tr. Vol. II, 65:15-17.)

47.	At Mr. Baranski's trial, during cross-examination, Carmi was specifically asked if he believed that he was going to get a further reduction pursuant to a Rule 35 motion and Carmi denied that the Government promised him a Rule 35 in exchange for testifying against Mr. Baranski:

> Q: [by Mr. Gardiner]  And you wanted another – you expected you were going to get another deal for actually testifying, didn't you?
>
> A:  I never said that, and I never expected it.  I've never been promised anything. And as a matter of fact, I've never asked for anything except to be moved from Ste. Genevieve to St. Louis County so I could be closer for the phone bills.  It would be $3 instead of $10. And that's all I've ever asked this whole time.

(Trial Tr. Vol. II, 92:6-13.)

48. In addition, Mr. Baranski's attorney asked Carmi at trial, "But you did get your sentence cut in half for agreeing to testify?" Carmi testified, "Yes, sir, I did." (Trial Tr. Vol. II, 92:14-16.)

49. Carmi testified that his sentence exposure was 76 to 86 months. (Trial Tr. No. 4:02-CR-361 CAS, Vol. II, 42:6-11.) Carmi's sentence exposure was actually 78 to 97 months. (Sent. Tr., Gov't Ex. Q, 4:4-13.) Carmi's Presentence Investigation Report incorrectly stated that Carmi was facing 87 to 108 months, but Judge Webber corrected this at Carmi's sentencing. (Id.)

50. AUSA Martin did not correct this error in Carmi's testimony at Mr. Baranski's trial.

51. Carmi's former attorney Rogers testified in his deposition that AUSA Poehling told him orally that as long as Carmi continued to testify truthfully and assist the Government in his testimony against Mr. Baranski, "he anticipated the Government would file a Rule 35, further reducing James Carmi's sentence." (Tr. Vol. I, 190:19-24.)

52. After Carmi was sentenced, Rogers sent Carmi a letter in November 2001 that stated in part, "Your sentence should be significantly reduced so long as your cooperation continues. Assistant United States Attorney Richard Poehling will file a Rule 35 motion within the next six (6) months. After this has been filed, I anticipate a significant further reduction in your sentence." (Letter from Rogers to Carmi (Nov. 14, 2001), Pet.'s Ex. 15.)

53. Carmi's former attorney Rosenblum wrote a letter to Carmi in March 2002 that stated, "The government should be finishing up their investigation in the next month. Once their investigation is completed, I have been told by Assistant U.S. Attorney Poehling that there will be a further reduction of your sentence." (Letter from Rosenblum to Carmi (Mar. 20, 2002), Pet.'s Ex. 16.)

54. Rosenblum testified in his deposition, "As I said, I recall a discussion or discussions with Mr. Poehling as this case was proceeding. And my impression never changed. Leaving those

discussions, my impression was Mr. Poehling was going to recommend a Rule 35." (Rosenblum Dep., Gov't Ex. P, 28:8-15.)

56. 55. Rogers wrote Carmi a letter in May 2002 that stated in part, "The Rule 35 will be filed. Dick Poehling will wait until the cases are disposed of, however, before filing his motion. I promise we will not forget to follow up on your behalf." (Letter from Rogers to Carmi (May 3, 2002), Pet.'s Ex. 17.)

56. At Mr. Baranski's trial, his attorney asked Carmi if he told Robert Matuszny ("Matuszny"), an investigator for Mr. Baranski, that he expected to get a Rule 35 motion to further reduce his sentence. In response, Carmi testified, "No, sir. Q: You didn't tell him that? A: No. Q: You never mentioned Rule 35 to him? A: I asked him what it was." (Trial Tr. Vol. II, 91:2-15.)

57. Over a month before Mr. Baranski's trial, he hired Matuszny to interview Carmi. (Tr. Vol. I, 81:2-13.) At Mr. Baranski's trial, Matuszny was asked what Carmi told him about a Rule 35, and he testified, "[Carmi] told me *he was going to ask* for a Rule 35, and he explained to me it was a reduction in sentence to apply for it under federal law, that if he testifies against Keith Baranski, he was going to *ask for* that rule to shorten his sentence." (Trial Tr. Vol. IV, 27:11-16) (emphases added).

58. At the evidentiary hearing, Carmi testified that the "Government never promised [him] a Rule 35." (Tr. Vol. II, 65:18-21.)

59. Carmi also testified at the evidentiary hearing that he believed he was asked at Mr. Baranski's trial, "Did the Government promise you anything?," and he testified, "No." (Tr. Vol. II, 38:17-20.) According to Carmi, he testified truthfully when he testified at Mr. Baranski's trial. (Tr. Vol. II, 38-39.) Carmi testified that he remembered being asked about a Rule 35 twice at Mr.

Baranski's trial and he believed he was asked whether the Government promised him a Rule 35 and he testified truthfully "no" both times. (Tr. Vol. II, 65:22-66:5.)

60. At the evidentiary hearing, Carmi was asked whether, at the time he responded "no" during Mr. Baranski's trial, he was confident that he did not have an offer of a Rule 35. Carmi testified, "It's kind of a complicated situation. My lawyer said this, this and this. I talked with Agent Mike Johnson, and he asked me if I had a promise, and he – and I said, yeah. And he said, 'No, you don't. You don't have no promise.' Then I talked to Jim Martin the next day, and he said, 'No, you don't have no promise.'" (Tr. Vol. II, 38:23-39:3.)

61. Carmi further testified at the evidentiary hearing, "So the Government said I don't have no promise, my lawyer said I do have a promise. The lawyer asked me, 'Does the government promise you nothing?' I told the truth. The Government said I don't have no promise." (Tr. Vol. II, 39:4-7.)

62. Carmi testified at the evidentiary hearing that during his sentencing hearing before Judge Webber, he did not hear Judge Webber's statement that a further reduction in his sentence might be possible. Carmi testified he did not realize Judge Webber had made the statement until he was looking at the sentencing transcript two years ago, i.e., twelve years after he testified against Mr. Baranski. (Tr. Vol. II, 78:7-17.)

63. AUSA Poehling testified that in his thirty-two years with the USAO, he only filed a Rule 35 motion twice. (Tr. Vol. II, 100:10-13.) In the twenty years that AUSA Martin worked for the USAO, he never filed a Rule 35 motion. (Tr. Vol. II, 175:9-10.)

64. The only two cases in which AUSA Poehling filed a Rule 35 motion occurred at the request of the Federal Bureau of Prisons and involved prisoners who provided assistance to guards in the Bureau of Prisons. (Tr. Vol. II, 100:14-101:2; Poehling Dep., Pet.'s Ex. 120, 26:16-19.)

65. Defendants were never given a 5K1.1 reduction along with a Rule 35 for the same information and testimony because that could not be done in good faith. (Tr. Vol. II, 101:8-10; Poehling Dep., Pet.'s Ex. 120, 40:23-41:18.)

66. AUSA Poehling never promised Carmi's attorneys, either Rogers or Rosenblum, that he would file a Rule 35 motion on behalf of Carmi in addition to the 5K1.1 motion that was promised in the Plea Agreement. (Tr. Vol. II, 101:11-21, 138:14-23.)

67. There is no evidence of any document authored by anyone with the United States Attorney's Office referring to a promise of a Rule 35 to Carmi prior to Mr. Baranski's trial. (Tr. Vol. I, 185:7-186:10; Vol. II, 188:2-11; Baranski Dep., Gov't Ex. D, 208:7-209:16 (any claimed discussions about a Rule 35 were allegedly communicated verbally); Rogers Dep., Gov't Ex. O, 27:20-28:2 ("I don't recall ever receiving anything from Dick Poehling in writing regarding a Rule 35.")).

68. AUSA Poehling recalled having a series of conversations with Rogers in which Rogers asked about a Rule 35 "in reference to the Baranski information" and Poehling told Rogers that information regarding Mr. Baranski would not qualify as newly discovered evidence pursuant to Rule 35. (Tr. Vol. II, 129:17-130:1; Poehling Dep., Pet.'s Ex. 120, 26:4-24, 27:13-16.) In the event that Carmi came up with something totally unrelated to the Baranski investigation that was newly discovered, then there was a possibility that a Rule 35 further reduction could apply, but that never happened. (Tr. Vol. II, 99; Poehling Dep., Pet.'s Ex. 120, 26:9-12; 27:11-13; 28:4-12.)

69. AUSA Poehling does not recall having any discussions with Rosenblum regarding Carmi's case. (Tr. Vol. II, 129:20-21.) Rosenblum did not remember any discussion with AUSA Poehling prior to Carmi's sentencing regarding a Rule 35, but testified vaguely that he had probably more than one informal discussion with AUSA Poehling on the issue. (Rosenblum Dep., Gov't Ex.

P, 22:2-14, 32:11-14.)  In addition, Rosenblum does not have any recollection of speaking with AUSA Martin regarding Carmi or a Rule 35 reduction.  (Id., 33:7-11.)

70.  All of the claims of discussing a promise of a Rule 35 reduction came from alleged discussions between Rogers and AUSA Poehling, and not AUSA Martin.  (Rogers Dep., Gov't Exhibit O.)

71.  Mr. Baranski attempted to add AUSA Poehling as a defendant in his civil lawsuit in Kentucky in 2002.  Immediately thereafter, AUSA Poehling recused himself and every other AUSA in the USAO's Violent Crime Unit from the Baranski case because of a conflict of interest that would result from prosecuting someone who named him as a defendant in a lawsuit.  (Tr. Vol. II, 135:13-24; Poehling Dep., Pet.'s Ex. 120, 15:16-24.)

72.  AUSA Martin replaced Poehling in the Baranski investigation.  The only time AUSA Poehling talked to AUSA Martin about the case was after Mr. Baranski's criminal trial ended, when AUSA Martin asked AUSA Poehling if he promised Carmi a Rule 35, and AUSA Poehling said no. (Tr. Vol. II, 136:2-9; Gov't Ex. A.)

73.  In the six-month period from when AUSA Martin took over the case until Mr. Baranski's trial, AUSA Martin did not have any communication with Carmi's counsel regarding a Rule 35 sentence reduction.  (Tr. Vol. II, 176:15-18.)

74.  In his pretrial meetings with Carmi, AUSA Martin repeatedly told Carmi to tell the truth, as he instructed every witness.  (Tr. Vol. II, 172:25-173:6; Tr. Vol. II, 67:11-25.)

75.  AUSA Martin testified that he talked with Carmi during pretrial preparation sessions about the 5K1.1 deal he had received, and told Carmi he needed to tell the jury he was testifying as part of an ongoing pledge of cooperation.  Martin had no discussions with Carmi of any further possibility of receiving any additional benefit from the Government.  Martin told Carmi explicitly

that he was not going to get anything else in exchange for testifying at Mr. Baranski's trial. (Tr. Vol. II, 173:11-174:6.)

76. AUSA Martin testified, "When we talked about the deal we went over specifically that he already had his 5K1 motion. He already got his reduction in sentence from, I think it was Judge Webber, and that that was the extent of what he was getting. At the time we were unaware of any discussion of consideration of a Rule 35. So it wasn't a matter of saying, 'I don't know what you thought before. You are not going to get this.' It was just a matter of pointing out, 'You've got what you got. That's all you are going to get. You need to explain to the jury that you are here as part of your ongoing pledge of cooperation.'" (Tr. Vol. II, 173:14-25.)

77. Carmi also testified that Agent Johnson specifically told him that he did not have a promise of a Rule 35 prior to Carmi testifying at Mr. Baranski's trial. (Tr. Vol. II, 57:21-58:12.)

78. AUSA Martin had no discussion with Carmi of any consideration of any further possibility of any additional benefit from the Government. (Tr. Vol II, 174:1-6.)

79. Carmi never told AUSA Martin that he believed he was going to get a further sentence reduction before testifying at Mr. Baranski's trial. (Tr. Vol. II, 66:1-19, 174:7-11.) Even when AUSA Martin told Carmi that he had no promises, Carmi never told AUSA Martin that his attorneys promised him a Rule 35 sentence reduction. (Tr. Vol. II, 66:16-19.)

80. Carmi's counsel did not attend any of the pre-trial preparation sessions and never talked with AUSA Martin before Mr. Baranski's trial. (Tr. Vol. II, 174:16-24; Rogers Dep., Gov't Ex. O, 29:9-11.)

81. Carmi never told Rogers that AUSA Martin specifically told Carmi he was not getting any promises in exchange for testifying against Mr. Baranski. (Rogers Dep., Ex. O, 30:7-10.)

82.  Before he testified against Mr. Baranski, Carmi never wrote any letters to any government officer, including AUSA Martin or AUSA Poehling, regarding a promise of a Rule 35. (Tr. Vol. II, 65:1-7.)

83.  On November 26, 2002, after Mr. Baranski's trial had ended, Rogers called AUSA Martin and asked whether Carmi was going to receive a further sentence reduction pursuant to Rule 35.  (See Letter from AUSA Martin to John Rogers (Dec. 2, 2000), Gov't Ex. A; Tr. Vol. II, 176:19-178:24.)

84.  AUSA Martin told Rogers during the call that he was "disinclined to do a Rule 35, but that [he] would talk to Dick Poehling and others in the office to see whether anybody thought it was appropriate for Mr. Carmi to get a Rule 35.  The reason I would have had to talk to Dick Poehling was because I knew that Jim Carmi got a 5K1 motion and successfully received a reduction in sentence, and so I wanted to talk to Dick Poehling [about] whether he thought it was even conceivable that our office would provide two bites at the apple for the same set of cooperation efforts."  (Tr. Vol. II, 178:4-13.)

85.  After talking with AUSA Poehling and others, AUSA Martin wrote a letter to Rogers that stated, "According to both you and Dick [Poehling], there was no promise from the Government to file a Rule 35 motion.  Rather Dick told you he would leave open the possibility of such a motion."  (Letter from AUSA Martin to John Rogers (Dec. 2, 2000), Gov't Ex. A; Tr. Vol. II, 178:19-23.)

86. AUSA Martin specifically used the phrase "according to both you and Dick" in the letter because, "I had the conversation first with John Rogers, and that was what he had indicated to me, was that there was not a promise, though he had indicated that I should talk to Dick because he thought Dick had indicated there was a possibility of it.  And so I -- I, one, had that information from

John Rogers. And then after the phone call, I spent some significant time with Dick Poehling to understand what the situation was and Dick also told me there was no promise by the Government for a Rule 35 motion." (Tr. Vol. II, 178:25-179:10.)

87. In the letter to Rogers, AUSA Martin also stated, "My dealings with Mr. Carmi also clearly indicate there was no promise from this office to seek a further reduction in his sentence." (Letter from AUSA Martin to John Rogers (Dec. 2, 2000), Gov't Ex. A; Tr. Vol. II, 179:15-17.)

88. AUSA Martin wrote this sentence in his letter because, "I thought it was important that John Rogers understood that there was nothing in my dealings with Mr. Carmi that would have suggested to me that Mr. Carmi would have thought there was any promise from the office. And I set forth two different reasons. One, I spent a lot of time with Mr. Carmi, and he never suggested to me that that was the case. And to the contrary we had . . . had indicated to him that he would not be getting any further reduction in sentence, at least based on the Baranski case. But, second, he testified about -- he was asked that during cross-examination, and he specifically testified at trial that he had not expected a Rule 35 and had not been promised one. So based on those two factors, I was comfortable saying that all indications from Mr. Carmi was he had no expectation of a Rule 35." (Tr. Vol. II, 179:19-180:9.)

89. AUSA Martin also stated in the letter to Rogers, "Rule 35 has a one year limitation period, unless Mr. Carmi provided information he did not know in the one year period." (Letter from AUSA Martin to John Rogers (Dec. 2, 2000), Gov't Ex. A.) AUSA Martin stated that Carmi was sentenced on November 8, 2001, and Mr. Baranski's trial started on November 11, 2002, and

therefore the one year period had already expired and Carmi could not have gotten a reduction pursuant to Rule 35 as a matter of law.[5]  (Id.)

90.  Finally, AUSA Martin stated in his letter to Rogers, "If you believe my facts are incorrect, please give me a call."  (Id.)

91.  In a letter to Carmi from Rogers dated February 17, 2003, Rogers stated, "Jim Martin's position is even if Dick did provide the Rule 35, you are not entitled to it because you lied when being questioned about this very issue at trial."  (Pet.'s Ex. 1.)  This statement is not accurate because it was never AUSA Martin's position that Carmi lied.  (Tr. Vol. II, 180:10-15.)

92.  AUSA Martin did not think that Carmi lied on the stand and he never indicated to Rogers either in writing or verbally that he thought Carmi lied.  (Tr. Vol. II, 180:10-15.)

93.  When AUSA Martin was asked about Rogers' statement in the letter to Carmi that Martin said Carmi had lied when questioned about a Rule 35, AUSA Martin testified it was his position that Carmi "would have lied about it if he was taking the position that he was actually promised [a Rule 35].  Because he said on the stand that he was not promised that.  But that was not – that was not the way I communicated the information – my position to John Rogers.  It wasn't – it was if he's taking that, I need to take it to the Court.  And in the earlier [letter], when I quote from the transcript, the purpose of that was to show that every piece of evidence I had indicated that there was no promise, not to say 'watch out, he lied.'"  (Tr. Vol. II, 186:13-22.)

94.  On December 2, 2002, after Mr. Baranski's trial had ended, AUSA Martin moved to have Carmi's sentencing transcript unsealed based on the November 26, 2002 conversation he had with Rogers.  (Tr. Vol. II, 181:6-13; Pet.'s Ex. 18.)

---

[5]AUSA Martin's letter of December 2, 2002 stated that the trial started on November 11, 2002, but the trial transcript indicates that testimony did not start until November 12, 2002.

95. AUSA Martin testified that he had not seen Carmi's sentencing transcript and did not have a copy of the transcript until after Mr. Baranski's trial, as it was under seal. (Tr. Vol. II, 190:23-191:4.)

96. Because AUSA Martin did not have a copy of Carmi's sentencing transcript, he would not have represented the content of the transcript to Mr. Baranski's attorneys, but instead told them in letters during the discovery process before Mr. Baranski's trial that they could seek permission from the Court to have the transcript released from under seal. (Tr. Vol. II, 190:19-22.)

97. In a letter to Mr. Baranski's attorney Sanders dated August 21, 2002, written in response to Sanders' requests for discovery contained in a letter dated August 15, 2002, AUSA Martin stated in pertinent part, "As to the transcript of the plea and sentencing of Mr. Carmi and Mr. Knipp, no transcript has been made, but you can contact the court reporter and request a copy since it is a public record." (Letter from Martin to Sanders (Aug. 21, 2002), Gov't Ex. J at 2.)

98. Mr. Baranski's defense counsel Gardiner admitted that he was aware Carmi's sentencing transcript was sealed, but did not make any attempt to get it unsealed before Mr. Baranski's trial. (Tr. Vol. I, 50:19-23, 85:7-17.) In addition, Gardiner admitted that the sentencing transcript was under seal pursuant to a Court policy, and not by action of the USAO. (Tr. Vol. I, 84:7-17.) Mr. Baranski admitted that AUSA Martin told him that Martin could not provide him with a copy, but that Mr. Baranski needed to get it from the court reporter. (Baranski Dep., Gov't Ex. D, 126:18-25.)

99. After he reviewed the sentencing transcript following Mr. Baranski's trial, AUSA Martin did not think that it meant Carmi was promised a Rule 35 sentence reduction. (Tr. Vol. II, 182:4-183:22.)

100. AUSA Martin testified, "I don't know what my thought was back then, but I didn't think it meant that somebody was promised a Rule 35 motion. In fact, I would have assumed if

somebody had been promised a Rule 35 motion that would have been very explicit. Also, I was aware at the time that Mr. Carmi was at least available to possibly cooperate against other targets besides Keith Baranski. So I didn't know whether the comment – I assumed, actually, in talking to Dick Poehling that the comment wasn't related to the Baranski trial but may have been related to other potential cooperation Mr. Carmi might have been doing." (Tr. Vol. II, 182:22-183:8.)

101. The sentencing transcript does not indicate that there was a promise of a Rule 35 for Carmi, and further does not indicate that Judge Webber's mention of continued cooperation was in reference to the case against Mr. Baranski. (Carmi Sent. Tr., Gov't Ex. Q, 7:17-25.)

102. After AUSA Martin sent the December 2, 2002 letter to Rogers, AUSA Martin and Rogers talked again about the Rule 35 issue. AUSA Martin sent another letter to Rogers dated January 9, 2003. (Tr. Vol. II, 183:23-184:24; Letter from Martin to Rogers (Jan. 9, 2003), Gov't Ex. B.)

103. AUSA Martin's January 9, 2003 letter to Rogers stated, "As a follow-up to my letter of December 2, 2002, and our telephone conversation of yesterday, please notify me as soon as possible in writing if you believe that Dick Poehling made any promise, expressed or implied, to your client that he would get a Rule 35 motion for his testimony in the Baranski trial. While everything set forth in my December 2, 2002 letter still holds true, given Mr. Carmi's testimony regarding this issue, I may need to notify the Court and opposing counsel if you believe there was such a promise." (Letter from Martin to Rogers (Jan. 9, 2003), Gov't Ex. B; Tr. Vol. II, 185:10-18.)

104. AUSA Martin testified he wrote the January 9, 2003 letter "to be able to ensure that they were not claiming that there had been a promise made by Dick Poehling. And if there had been a promise made, I felt that we would likely have to take that to the Court because it was contrary to

what Mr. Carmi had testified at the trial; and, therefore, Mr. Baranski and the Court would need to know about that." (Tr. Vol. II, 185:22-186:6.)

105. Rogers testified that he received AUSA Martin's letter dated December 2, 2002 and AUSA Martin and Rogers had one phone conversation after his receipt of that letter, but Rogers did not respond in writing to AUSA Martin's December 2, 2002 letter. (Tr. Vol. II, 187:7-13; Rogers Dep., Gov't Ex. O, 30:11-23.)

106. Rogers received AUSA Martin's letter dated January 9, 2003, but never replied to it. (Tr. Vol. II, 187:7-13; Rogers Dep., Ex. O, 30:11-23.)

107. Neither Rogers nor Rosenblum ever filed anything with the Court indicating that there was a promise of a sentence reduction on behalf of Carmi. (Tr. Vol. II, 187:14-20.)

108. Overall, Carmi testified truthfully at Mr. Baranski's criminal trial that he was not promised a Rule 35 sentence reduction. (Tr. Vol. II, 65:18-66:19.) In a letter sent to this Court regarding his testimony at Mr. Baranski's trial, Carmi said, "I told the truth as I believed it. I did not lie in your court." (Gov't Ex. F at 2; Tr. Vol. II, 70:15-71:7.)

D. <u>COUNT II – Carmi testified extensively and truthfully at Mr. Baranski's trial regarding his injury and claimed memory loss issues</u>

109. Carmi testified at Mr. Baranski's trial that in May 2000, he "ran into a truck with [his] motorcycle and [he] was hurt pretty bad." (Trial Tr. Vol. II, 21:1-2.)

110. Carmi also testified at Mr. Baranski's trial, "I had a bad head injury, and I was sedated for about 12 days. They kept me out with large doses of narcotics, I guess, and then from like the 2nd to the 12th. And then after that I was awake, but I'll be honest, I don't remember it all." (Trial Tr. Vol. II, 21:4-8.)

111. Carmi testified at Mr. Baranski's trial, "And I have blackouts. I have severe memory problem, still struggle with that." (Trial Tr. Vol. II, 21:21-22.)

112. Carmi testified, "I did have memory loss, but it wasn't bad enough to know that I wasn't real guilty for what I was arrested for. I knew I was doing something wrong, and I didn't want to admit it, so I just said I couldn't remember it." (Trial Tr. Vol. II, 48:11-14.)

113. Carmi also testified that he claimed, "I don't remember nothing," but also told the jury, "That was not true." (Trial Tr. Vol. II, 22:2-10.)

114. Carmi was asked at Mr. Baranski's trial, "So you have both memory loss problems and you lie to doctors both?" and in response he testified, "I guess that's probably true, sir." (Trial Tr. Vol. II, 48:15-17.)

115. At Mr. Baranski's trial, Matuszny testified that he met with Carmi and Carmi told him "he had memory losses. And actually after he – I guess he was in a coma for several weeks at the hospital, and after he was released from the hospital, he had no memory of who he was or what he was, meaning that he was a criminal, until he returned home and was basically informed as to who and what he was." (Trial Tr. Vol. IV, 26:25-27:6.)

116. Mr. Baranski's defense attorneys were aware, or should have been aware, of Carmi's mental and medical condition prior to Mr. Baranski's criminal trial. As part of the discovery in Mr. Baranski's criminal case, Mr. Baranski and his attorneys knew that Carmi had experienced or was diagnosed with a head injury before trial. (Baranski Dep., Gov't Ex. D, 54:9-13.) In addition, Mr. Baranski and his counsel knew that Carmi had been diagnosed with memory impairment or memory loss before his trial. (Id., 54:14-16.) Further, Mr. Baranski and his counsel knew that Carmi had been diagnosed as a malingerer. (Id., 54:17-19.)

117. Mr. Baranski first learned of Carmi's motorcycle accident from Vicki Carmi, Carmi's wife, when Carmi was in a coma in the hospital in May 2000, and Vicki did not know whether he was going to live or die. (Baranski Dep., Gov't Ex. D, 44:21-45:14.) Mr. Baranski also knew that Carmi had an injury because when he spoke with him after the accident, in his view, "he was in rough shape." (Id., 74:12-13.)

118. In addition, Mr. Baranski's defense team hired a private investigator who talked with Carmi before Mr. Baranski's trial and Carmi told the investigator that he had memory problems. (Tr. Vol. I, 81:2-82:3; Baranski Dep., Gov't Ex. D, 55:1-13; Trial Tr. Vol. II, 48:9-17.)

119. Mr. Baranski's defense team had copies of medical records regarding Carmi.[6] Prior to his trial, Mr. Baranski and his counsel learned that Carmi had been psychologically and medically examined by the Bureau of Prisons and they received from the Government a copy of the Forensic Report from the Springfield Medical Center ("Springfield Forensic Report") "that detailed extensively Mr. Carmi's medical and psychological history". (Baranski Dep., Gov't Ex. D, 48:14-20, 51:17-19, 56:7-57:24; Springfield Forensic Report, Gov't Ex. E; Tr. Vol. I, 75:4-76:19, 83:2-8, 162:20-163:1.)

120. The Springfield Forensic Report is twenty-eight pages long and discussed all of the sources of information used to evaluate Carmi, Carmi's personal history, behavioral observations and hospital course, the offenses charged against Carmi, his psychological test results, general

---

[6]Mr. Baranski's former attorney Gardiner testified that the defense team had a copy of the Springfield Forensic Report, but his former attorney Sanders claimed he never received any BOP documents from the Government. (Tr. Vol. I, 74:2-76:19 (Gardiner); 99-103 (Sanders).) The Court notes, however, that Mr. Sanders' testimony is contradicted by his letter to AUSA Martin of August 15, 2002, which states in pertinent part, "As to James Carmi, thank you for providing the report of mental examination with a finding of competence which was prepared by the Bureau of Prisons Medical Center at Springfield, MO." (Letter from Sanders to Martin (Aug. 15, 2002), Gov't Ex. H at 10.)

cognitive functioning issues, clinical formulation, and Dr. Denny's discussion and opinions and prognosis. (Springfield Forensic Report, Gov't Ex. E.)

121. Regarding the sources of data for the Springfield Forensic Report, a thorough evaluation was performed on Carmi including routine observations, formal interviews, medical history and physical examination, neurological consultation, CT scan study of his head and electroencephalogram, and administration of eighteen psychological tests. (Springfield Forensic Report, Gov't Ex E.)

122. Numerous other sources were reviewed for the Springfield Forensic Report, including other medical records, telephone calls between Carmi and his relatives, ATF Report of Investigations, Carmi's Social Security Notice of Disapproved Claims and undercover videotapes of Carmi and ATF agents dated August 13, 2000 and October 6, 2000. (Springfield Forensic Report, Gov't Ex. E, 2-3.)

123. The details of the videotapes were documented and established that Carmi was able to "follow a conversation as indicated by his ability to ask direct questions that are appropriate to the conversation;" "he is able to effectively problem solve for other individuals;" he also demonstrated "abstract reasoning and an ability to effectively problem solve within a short duration;" he was also able to recall specific information, follow a conversation; "ask socially appropriate questions;" and "demonstrate short-term memory and long-term memory." (Springfield Forensic Report, Gov't Ex. E, 15-16.) The Springfield Forensic Report also noted that in the video Carmi told undercover agents he "sustained mild brain damage." (Id., 12.)

124. The Springfield Forensic Report detailed Carmi's claims of memory loss and mental health claims. Carmi reported that after his motorcycle accident he "was told when [he] woke up [he] had the mentality of a three-year-old." (Springfield Forensic Report, Gov't Ex. E, 6-7.) Carmi

reported that he "can't remember anything I had to relearn everything." (Id. 7, 11.) "Carmi indicated he had sustained memory impairment following his motorcycle accident." (Id., 11.) When asked about his past criminal behavior, Carmi stated, "I have some recollection of it, but I don't have details of that much anymore." (Id.) Carmi also indicated that he was not employed after his accident because "he had difficulty remembering." (Id.) "I don't remember much following the accident." (Id.) Carmi also said, "[I]t seems like since the accident I only remember what people tell me from years previous. Something's happening to my brain." (Id.)

125. Despite Carmi's statements, Dr. Robert Denny, a board-certified physician in neuropsychology and forensic psychology, found based on all of the evidence reviewed that Carmi "grossly over exaggerated items indicative of physical complaints" and the "resulting profile would be classified as a malingering illness profile in light of the fact other scales reveal consistency throughout the test, indicating that he understood the items he was reading." (Springfield Forensic Report, Gov't Ex. E, 18, 28.) Dr. Denny also stated that Carmi's performance on the actual memory test "is more indicative of malingering than true brain injury performance." (Id., 19.)

126. When asked at the evidentiary hearing if he agreed with Dr. Denny's conclusion, Carmi testified, "Yeah. I was faking." Carmi claims, however, that he was "trying to be really normal." (Tr. Vol. II, 34:11.)

127. Because Gardiner and Sanders had the Springfield Forensic Report prior to Mr. Baranski's trial, they were aware of all the information contained therein including all of Carmi's statements, and could have cross-examined Carmi regarding them. (Tr. Vol. I, 75:11-12.)

128. In addition, Mr. Baranski's criminal defense team received certain of Carmi's medical records from the Rochester Federal Medical Center in Minnesota prior to Mr. Baranski's trial. (Baranski Dep., Gov't Ex. D, 61:1-64:6, Tr. Vol. I, 172:11-16.) Mr. Baranski's counsel also sought

and received prior to trial some of Carmi's medical records from St. Anthony's Hospital in St. Louis. (Baranski Dep., Ex. D, 73:18-74:10; Tr. Vol. I, 83, 173:3-10.)

129.  Mr. Baranski contends the Government should have provided copies of certain other Bureau of Prison ("BOP") records of various types concerning Carmi (see Pet.'s Exs. 12-14, 38-48, 53-56), some of which indicate that Carmi believed he was going to get a reduction in his sentence, and others that record Carmi's assertions he had brain damage from a motorcycle accident and suffered from resulting memory problems, dizziness and blackouts.

130.  Gardiner conceded that all of the statements Carmi made in the exhibits Mr. Baranski contends should have been disclosed – the fact that he had an accident, has brain damage, doesn't remember well – were all contained in the Springfield Forensic Report which he received prior to trial.  (Tr. Vol. I, 80: 19-24.)

131.  In a letter to Sanders dated August 21, 2002, written in response to requests for discovery contained in a letter from Sanders dated August 15, 2002, AUSA Martin stated in pertinent part, "I have also enclosed certain medical records from the Federal Prison in Minnesota. I have pulled out the records related to mental or psychological issues.  I do not intend on providing his other medical records."  (Letter from Martin to Sanders (Aug. 21, 2002), Gov't Ex. J at 4.) Gardiner and Mr. Baranski conceded there is no evidence to establish that the USAO had possession of copies of the records presented Mr. Baranski offered at the evidentiary hearing, prior to Mr. Baranski's criminal trial.  (Tr. Vol. I, 71:7-18, 165:8-20.)

132.  AUSA Martin's August 21, 2002 letter to Sanders stated in part, "Any Brady material of which we are aware, has been provided.  As you have just now made a Giglio request, I will begin the process to retrieve any such information."  (Letter from Martin to Sanders (Aug. 21, 2002), Gov't Ex. J at 2.)

133. Both Sanders and Gardiner admitted they received a voluminous amount of discovery prior to Mr. Baranski's trial. (Tr. Vol. I, 16:22-25 (Gardiner was given multiple Bankers Boxes of records); 95:9-10 (Sanders testified they received a "high volume" of documents).)

134. Mr. Baranski's defense team did not themselves seek to obtain any records from the BOP regarding Carmi prior to Mr. Baranski's trial, even though they knew they existed. (Tr. Vol. I, 102:22-25; 116:13-18.) Sanders testified he relied on AUSA Martin's statements that he had reviewed Carmi's medical and psychiatric records and that they contained "nothing exculpatory or of any impeachment value." (Tr. Vol. I, 102:12-21.)

135. Based on the testimony of numerous witnesses, Carmi did not have memory problems that would have prevented him from testifying truthfully in Mr. Baranski's trial. According to AUSA Poehling, Carmi's state of mind was lucid, he was oriented to time and place, and he "came forth with an amazing amount of detail regarding prior events involving the machine guns." (Tr. Vol. II, 90:7-9.)

136. While Carmi told ATF Agent Johnson that he had problems remembering things, Johnson testified that Carmi "was very lucid" and had "a well-above average memory and recollection of the facts." (Tr. Vol II, 154:23-24; 161:23-162:2.) ATF Agent Johnson testified that Carmi "has a remarkable memory for a lot of the things we talked about. We'd go into that [gun] vault, and he would explain. Before, during and after his arrest, he could tell serial numbers, dates, models, where he got it, what police letter he used." (Johnson Dep., Pet.'s Ex. 117, 99:6-11.)

137. Agent Johnson testified that in Carmi's first proffer, as they were talking Carmi started answering very slowly, hung his head, stuttered, stammered, and took thirty seconds or more to answer a question in the beginning. Agent Johnson confronted Carmi and said, "Jim, I've dealt with you already. I have spoken to you on the phone. I have spoken to you in person. I know this is not

you." Carmi then started answering lucidly from that point on. Agent Johnson testified that while Carmi stated he had been injured in a motorcycle accident, "Everyone involved in the investigation was impressed with his memory." (Tr. Vol. II, 155:2-21.)

138. Carmi's attorney, Rogers, was present during Carmi's proffers with the government and testified that Carmi had "elaborate information" with respect to Mr. Baranski and specifically testified that "no government agent spoon-fed Mr. Carmi factual information about Mr. Baranski." (Rogers Dep., Ex. O, 26:24-27:14.) Rogers also stated that "Carmi was quick to proffer information in detail against Mr. Baranski." (Id., 27:15-19.)

139. When AUSA Martin was asked if he told Carmi he had to tell the jury the truth about his medical and psychiatric condition, Martin testified, "I tell every witness that they have to tell the truth. And we were certainly exploring wanting to tell the truth about the full extent of his cooperation, his convictions and this unique issue, the full extent of his injury, his memory loss and his extent of feigning his memory loss." (Tr. Vol. II, 173:2-6.)

140. AUSA Martin never told Carmi to minimize or misrepresent the nature or the degree of his diagnoses. (Tr. Vol. II, 173:7-10.) Agent Johnson also testified that no one on behalf of the Government coached Carmi to downplay his memory impairment. (Id., 162:5-7.)

141. The evidence establishes that Carmi was mentally and physically competent to testify against Mr. Baranski, the Government disclosed the detailed Springfield Forensic Report and other records regarding Carmi before Mr. Baranski's trial, and Mr. Baranski's defense team obtained others independently. The BOP records Mr. Baranski believes should have been produced by the Government are largely cumulative of the information he and his defense team already possessed. (Tr. Vol. I, 80:19-24; 164:23-165:2, 175:25-176:5.)

E.  COUNT III – The Government did not mislead Mr. Baranski regarding the length of Carmi's incarceration exposure.

142.  At Mr. Baranski's trial, Carmi testified he believed his sentence exposure under the Sentencing Guidelines was 76 to 86 months, but that he was sentenced to 42 months because of his cooperation.  (Trial Tr. Vol. II, 42:6-16.)

143.  Judge Webber stated at Carmi's sentencing that Carmi was facing a range of 78 to 97 months because his total offense level was 26, with a criminal history category of 3.  (Sent. Tr., Gov't Ex. Q, 6:4-13.)

144.  The Presentence Investigation Report ("PSR") indicated that Carmi's guideline range was 87 to 108, but during Carmi's sentencing Judge Webber found the PSR's range to be inaccurate. (Sent. Tr., Gov't Ex. Q, 6:4-13; PSR, Gov't Ex. FF, 14.)

145.  Mr. Baranski claims the Government should have provided him a copy of Carmi's PSR, but that document was under seal pursuant to the standard procedures of the U.S. District Court for the Eastern District of Missouri, and the Government was prohibited from disseminating any of the information contained in the PSR.  (See Cover Letter to PSR, Gov't Ex. FF; Baranski Dep., Gov't Ex. D, 132:12-20.)

146.  Mr. Baranski's attorneys filed a motion in his criminal case for disclosure of Carmi and Knipp's PSRs.  Magistrate Judge Mary Ann L. Medler denied the motion stating, "The PSIs prepared for the sentencing of Carmi and Kipp [sic] are private, are filed under seal and defendant has no right to them under any rule of discovery, evidence or case law.  This request is denied." (Order and Report and Recommendation of United States Magistrate Judge, No. 4:02-CR-361 CAS, Doc. 54 at 7, ¶ 19.)  Mr. Baranski did not appeal the Magistrate Judge's ruling to the district court.

147. Carmi was sentenced before the Sentencing Guidelines became advisory, which meant the Court only had the authority to depart from the Guidelines under certain circumstances and had to make a record of the reasons for the departure. The sentencing in a typical case was within the Guidelines range. (Tr. Vol. II, 101:22-102:22.)

148. Judge Webber was not a party to the Plea Agreement between the Government and Carmi, and was not bound by the agreement. Judge Webber could have imposed whatever sentence he wanted to, up to the statutory maximum. (Tr. Vol. II, 102:6-12.)

149. Carmi's Plea Agreement did not refer to any possible departure from the Guidelines other than the 5K1.1 motion the Government agreed to file. (Tr. Vol. II, 103:12-16; Plea Agreement, Gov't Ex. C, 3-4.)

150. At the time of Mr. Baranski's trial, he and his attorneys knew what charges Carmi had pleaded guilty to, the potential length of sentence those charges carried, and the actual sentence that Carmi received. (Baranski Dep., Gov't Ex. D, 128:21-129:13; Tr. Vol. I, 66:11-67:23.)

151. Mr. Baranski's attorneys received a copy of Carmi's Plea Agreement in discovery prior to trial. (Tr. Vol. I, 172:5-10; 66:21-25.)

152. Prior to trial Mr. Baranski and his lawyers also received in discovery a copy of Carmi's prior criminal history. (Tr. Vol. I, 65:23-66:7 (Q. "All right. As part of the discovery in the criminal case with Mr. Carmi, did you receive a copy of his criminal history? A. I believe – I believe we received a copy of his NCIC printout. Q. That showed the convictions that he had and the dispositions of those? A. Well, not all of the dispositions, if I remember correctly. I believe it showed some charges without dispositions.")). Mr. Baranski testified that he traveled to a municipality where Carmi had been charged with burglary to verify the outcome of that charge against him. (Tr. Vol. I, 137:18-138:1.)

153.   Before Mr. Baranski's trial, his defense counsel was aware of the United States Sentencing Guideline ranges related to Carmi's federal criminal case and prior criminal history. (Tr. Vol. I, 67:21-69:9.)

154.   At the evidentiary hearing, Mr. Baranski's defense attorney Gardiner admitted that he cross-examined Carmi extensively at Mr. Baranski's trial about Carmi's sentence and the benefits he got from the Government.  (Tr. Vol. I, 69:6-9.)

155.   Mr. Baranski's Petition claims that Carmi could have been charged as an armed career criminal under the Armed Career Criminal Act, 18 U.S.C. § 924(e) ("ACCA"), and that Carmi was not charged thereunder due to an alleged undisclosed agreement between Carmi and the Government.  In a post-hearing filing, Mr. Baranski asserts that his claim is actually that Carmi "could have been facing long term imprisonment, and that his avoidance of that could have affected his credibility with the jury."[7]  Before Mr. Baranski's trial, his counsel knew or at least believed that Carmi could have been charged as an armed career criminal.  (Tr. Vol. I, 68:8-12.)

156.   Carmi did not qualify as an armed career criminal, a designation that would have carried a mandatory fifteen-year minimum sentence, because the ACCA required three prior felony convictions for serious drug offenses or violent felonies.  (Tr. Vol. II, 94:10-14; 18 U.S.C. § 924(e).)

157.   Carmi was not eligible to be considered an armed career criminal because some of his prior felony convictions were not predicate convictions under 18 U.S.C. § 924(e), as he received a suspended imposition of sentence in those cases.  (Tr. Vol. II, 117:14-24; Gov't Ex. FF, ¶ 46 (PSR refers to a March 27, 1981 conviction in St. Louis County; imposition of sentence was suspended

_____

[7] See Petitioner's Response to Respondent's Proposed Findings of Fact and Conclusions of Law, Doc. 316 at 58.

and Carmi was placed on three years' probation).)  This conviction would not qualify as a prior felony conviction under the ACCA.  (Tr. Vol. II, 117:25-118:3.)

158.   Whether a conviction constitutes a prior felony conviction for purposes of the ACCA is determined by the law of the jurisdiction where the conviction was charged.  (Tr. Vol. II, 118:8-11.)  Under Missouri law, a suspended imposition of sentence is not a considered a conviction.  (Tr. Vol. II, 118:17-24.)

159.   Paragraph 50 of Carmi's PSR refers to a burglary second conviction, and two convictions for stealing over $150.00 dollars in St. Louis County.  (Tr. Vol. II, 119:19-25; Gov't Ex. FF, ¶ 50.)  The stealing convictions are not considered crimes of violence, but the burglary conviction is considered a crime of violence.  The disposition of Carmi's burglary conviction was imposition of a suspended sentence and an unspecified period of probation.  (Tr. Vol. II, 120:8-15.)

160.   The federal conviction listed in paragraph 54 of Carmi's PSR is a conviction for conspiracy to possess with intent to distribute marijuana, which would qualify as a serious drug conviction.  (Tr. Vol. II, 120:22-121:5; Gov't Exhibit FF, ¶ 54.)

161.   Carmi's conviction for altering serial numbers in Tennessee in 1993 would not subject him to a fifteen-year mandatory minimum sentence.  (Tr. Vol. II, 121:9-18.)

162.   Carmi had a conviction in 1997 for attempted unlawful use of a weapon in St. Louis County.  This conviction would not have subjected Carmi to the fifteen-year mandatory minimum sentence because it was merely an attempt crime.  (Tr. Vol. II, 121:19-122:5.)

163.   In summary, Carmi did not qualify for the fifteen-year mandatory minimum sentence for an armed career criminal because at most he had one applicable conviction.  (Tr. Vol. II, 122:10-17.)

164. Mr. Baranski's defense counsel were familiar with how someone is considered to be an armed career criminal. (Tr. Vol. I, 68:13-15, 106:18-108:10.)

165. Mr. Baranski's defense team had all of the necessary information to make an educated determination regarding whether Carmi could have been convicted as an armed career criminal and could have cross-examined Carmi about that issue.

### F. Count V - Claims of Prosecutorial Misconduct and Vindictive Prosecution

166. On April 11, 2001, ATF agents seized Mr. Baranski's firearms from the Pars International Corporation's U.S. Customs Bonded Warehouse in Louisville, Kentucky, based in part on information provided by Carmi and pursuant to a search warrant issued by a U. S. Magistrate Judge in the Western District of Kentucky. See Baranski v. Fifteen Unknown Agents of ATF, 195 F.Supp.2d 862, 864 (W.D. Ky. 2002). On July 5, 2001, Mr. Baranski filed a civil action in the Western District of Kentucky against numerous ATF agents, including case agent in charge Special Agent Michael Johnson, and the United States. Baranski v. Fifteen Unknown Agents of ATF, No. 3:01-CV-398-H (W.D. Ky.). The action asserted, among other things, a Bivens claim.[8]

167. On March 7, 2002, a meeting was held attended by Mr. Baranski, his attorney William Ekiss, Department of Defense Agent William Armstrong, and AUSA Poehling. Mr. Baranski testified the purpose of the meeting was to discuss his ability as an importer to provide firearms to the Department of Defense. (Tr. Vol. 1, 126:18-24.) Mr. Baranski denied that the meeting was a proffer, (id., 127:10-24), but he and Ekiss signed a USAO proffer agreement at the meeting, at Ekiss' direction. (Id., 128:10-14; Gov't Ex. L.)

---

[8] Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). In Bivens, the Supreme Court recognized direct constitutional claims against federal officials acting in their individual capacities. Buford v. Runyon, 160 F.3d 1199, 1203 n.6 (8th Cir. 1998).

168. Ekiss testified that at the time of the meeting, Mr. Baranski was under investigation by the ATF and the USAO "on some form of a weapons violation," and he arranged the March 7, 2002 meeting with AUSA Poehling at Mr. Baranski's request to discuss weapons with the Department of Defense agent as a means of cooperating with the Government. (Tr. Vol. II, 5:13-20.) Ekiss testified they were "trying to avert an indictment" by holding the meeting (id., 7:20:25), and that he was not there to negotiate the sale of weapons to the U.S. Government (id., 14:11-13), although he also denied the meeting was a proffer. (Id., 17:10-18.)

169. AUSA Poehling testified that the purpose of the meeting was a proffer, Mr. Baranski was under investigation at the time, and the "standard proffer agreement" was entered into. (Tr. Vol. II, 132:10-133:5.)

170. Mr. Baranski testified that at the March 7, 2002 meeting, AUSA Poehling was angry, stated he was under a lot of pressure from Washington about Mr. Baranski's <u>Bivens</u> action (Tr. Vol. 1, 12:4-8), and told Mr. Baranski that if he didn't cooperate and drop the suit, AUSA Poehling would "indict your ass, send you to prison, and even when you get out, for the next 20 years there's going to be agents following you around." (Id., 131:8-12.) Subsequently, Mr. Baranski attempted to add AUSA Poehling as a defendant to the <u>Bivens</u> action, but his motion to do so was denied. (Id., 131:13-15.)

171. Ekiss testified that AUSA Poehling said for the March 7, 2002 meeting or any other meetings with the USAO to go forward, the <u>Bivens</u> action would need to be dismissed or withdrawn. (Tr. Vol. II, 8:13-17; 9:13-17.) Ekiss testified it was his understanding from the meeting and AUSA Poehling's anger and statements that if Mr. Baranski did not drop the <u>Bivens</u> action he would be indicted, although Ekiss did not "really believe it was worded in that fashion." (Id., 9:18-23.)

172. On March 27, 2002, Mr. Baranski signed an affidavit that detailed his recollection of the March 7, 2002 meeting, including a description of AUSA Poehling's statements. (Gov't Ex. CC.)

173. On April 1, 2002, Ekiss wrote a letter to Mr. Baranski summarizing the March 7, 2002 meeting. (Pet.'s Ex. 121.) The letter stated in part, "In what started as a non-confrontational meeting, turned ugly as Poehling went on the defensive and threatened us with getting the indictment, seeing you go to prison and claiming that ATF or some other government agency would be watching you for the next 20 years." (Id. at 1.)

174. AUSA Poehling denied telling Mr. Baranski that he was under pressure from Washington to indict him because of the Bivens action, that he would indict Mr. Baranski if he did not drop the suit, or that the Government would go after him for twenty years after he was released from prison. (Tr. Vol. II, 134:14-20.)

175. When AUSA Poehling was informed that Mr. Baranski was attempting to add him as a defendant in the Bivens action, he immediately filed a memo of recusal to the USAO for himself and everyone in his line of supervision. (Tr. Vol. II, 135:1-24.) AUSA Poehling was replaced by AUSA Martin as the head of the investigation. (Id., 135:25-136:1.)

176. After AUSA Poehling was recused from the case, he never discussed the investigation or prosecution of Mr. Baranski with AUSA Martin, except when AUSA Martin asked him following Mr. Baranski's trial if he had promised a Rule 35 to Carmi, and AUSA Poehling said no. (Tr. Vol. II, 136:2-9.)

G.  Present Adverse Consequences of Mr. Baranski's Conviction

177.  Mr. Baranski testified he is pursuing this coram nobis action to overturn his conviction in part so he can have the ability "to possess firearms and to continue the business that [he] was excluded from."  (Tr. Vol. I, 161:23-162:2.)

## IV.  Conclusions of Law

A.  Coram Nobis Standards

A writ of error coram nobis the proper way to "attack[] the validity of a sentence which has already been served."  Mustain v. Pearson, 592 F.2d 1018, 1021 (8th Cir. 1979).  "The writ of error coram nobis is an extraordinary remedy reserved for correcting errors of the most fundamental character."  Morgan, 346 U.S. at 512.  The Supreme Court has cautioned that "judgment finality is not to be lightly cast aside; courts must be cautious so that the extraordinary remedy of *coram nobis* issues only in extreme cases."  Denedo, 556 U.S. at 916.

Coram nobis relief is not warranted where the error complained of was not of the most fundamental character or could have been raised on direct appeal or in a 28 U.S.C. § 2255 motion. Camacho-Bordes, 94 F.3d at 1173; Azzone v. United States, 341 F.2d 417, 419 (8th Cir. 1965) (per curiam) ("Coram nobis may not be used as substitute for an appeal."); see Sawyer v. Whitley, 505 U.S. 333, 338 (1992) (successive habeas petition raising identical grounds as prior petition must generally be dismissed).

The burden is on the petitioner to show he is entitled to coram nobis relief on the merits of his claim.  Willis, 654 F.2d at 24.  In addition, coram nobis relief is not available "unless a petitioner can show that he . . . suffers from ongoing civil disabilities, or adverse collateral consequences, due to his . . . allegedly wrongful conviction[.]"  Tufte v. United States, 16 F.3d 1228 (8th Cir. 1994) (Table) (unpublished per curiam) (quoted case omitted); Stewart, 446 F.2d at 43-44 (petitioner must

demonstrate he is suffering from present adverse consequences to be entitled to coram nobis remedy).

B. Present Adverse Consequences

As a threshold matter, the government renews the argument previously made in its motions to dismiss and for summary judgment, that Mr. Baranski cannot obtain coram nobis relief because he failed to prove "present adverse consequences" from his conviction, citing McFadden v. United States, 439 F.2d 285, 287 (8th Cir. 1971), and Stewart, 446 F.2d at 43-44. The government cites cases from other circuits holding that a criminal conviction alone is not enough to show continuing collateral consequences, and argues Mr. Baranski has not shown such consequences as he testified he is currently unemployed because the instant case consumes much of his time and because he suffers significant disabilities as a result of injuries he incurred in the first Gulf War.

The Eighth Circuit has not had the opportunity to address in any detail the type of "present adverse consequences" that must be shown to authorize coram nobis relief. The First Circuit describes the case law concerning this requirement as "uneven," as some courts require something more than the mere fact of conviction, while others conclude sufficient collateral consequences naturally flow from the fact of conviction:

> For example, several courts have indicated that something more than the stain of conviction is needed to show continuing collateral consequences. See, e.g., Fleming v. United States, 146 F.3d 88, 90-91 & n.3 (2d Cir. 1998) (per curiam); United States v. Dyer, 136 F.3d 417, 429-30 & n.33 (5th Cir. 1998); Hager [v. United States], 993 F.2d [4,] 5 [(1st Cir. 1993)]; United States v. Osser, 864 F.2d 1056, 1059-60 (3d Cir. 1988); see also United States v. Keane, 852 F.2d 199, 203 (7th Cir. 1988) (holding that continuing collateral consequences arise only in situations where the disability is unique to a criminal conviction). Other courts have indicated that continuing collateral consequences invariably flow from a felony conviction alone. See, e.g., United States v. Peter, 310 F.3d 709, 715-16 (11th Cir. 2002) (per curiam); [United States v.] Walgren, 885 F.2d [1417,] 1421 [(9th Cir. 1989)]; United States v. Mandel, 862 F.2d 1067, 1075 & n. 12 (4th Cir. 1988). Yet another court has granted coram

nobis relief without mentioning the requirement.  See Allen v. United States, 867
F.2d 969, 971-72 (6th Cir. 1989).

United States v. George, 676 F.3d 249, 254 (1st Cir. 2012).

Here, Mr. Baranski both pleaded and testified that as a convicted felon, he cannot possess firearms or engage in his prior business of importing firearms, which requires a federal firearms license.  His inability to engage in this business or to obtain a federal firearms license could be considered something more than the mere stain of conviction.  In the absence of Eighth Circuit precedent on this issue, and in light of the varying standards adopted by other circuit courts, the Court declines to adopt the Government's position that Mr. Baranski cannot obtain coram nobis relief because he has failed to establish present adverse consequences from his conviction.

C.  The Government Did Not Promise Carmi a Rule 35 Reduction

In Count I, Mr. Baranski asserts that the government promised Carmi, the key witness against him at trial, a reduction in his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure in return for his testimony against Mr. Baranski, but when Carmi was asked on cross-examination whether he expected to receive a Rule 35 reduction or other consideration in exchange for his testimony, Carmi lied and denied that any such promises had been made.  Mr. Baranski asserts that the government was fully aware of Carmi's untruthfulness and coached him to deny the existence of a promise for a Rule 35 sentence reduction, and willfully and deliberately withheld this exculpatory and impeachment material from defense counsel.

In Brady v. Maryland, the Supreme Court held that if the prosecution suppresses evidence favorable to an accused after a request for disclosure by the defendant, due process is violated "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id., 373 U.S. 83, 87 (1963).  "Under Brady and its progeny, prosecutors

have a duty to disclose to the defense all material evidence favorable to the accused, including impeachment and exculpatory evidence."  United States v. Robinson, 809 F.3d 991, 996 (8th Cir. 2016).  Evidence that could be used to impeach a prosecution witness falls within the Brady rule. United States v. Bagley, 473 U.S. 667, 676 (1984); Reutter v. Solem, 888 F.2d 578, 581 (8th Cir. 1989).  "This duty extends not only to evidence of which a prosecutor is aware, but also to material 'favorable evidence known to the others acting on the government's behalf in the case, including the police.'"  Robinson, 809 F.3d at 996 (quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995)); see Youngblood v. West Virginia, 547 U.S. 867, 869-70 (2006) (per curiam).

The Brady rule requires that a "conviction be reversed, however, only if the undisclosed impeachment evidence was material to the question of petitioner's guilt."  Reutter, 888 F.2d at 581. The Supreme Court has "explained that 'evidence is "material" within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'"  Smith v. Cain, 132 S. Ct. 627, 630 (2012) (quoting Cone v. Bell, 556 U.S. 449, 469-70 (2009)).  "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'"  Id. (quoting Kyles, 514 U.S. at 434).  See also Wearry v. Cain, 136 S. Ct. 1002, 1006 (2016) (per curiam) (habeas petitioner "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict.") (quoting Smith, 132 S. Ct. at 630).

Having heard all of the evidence, the Court finds that the Government did not promise Carmi a further reduction in his sentence under Rule 35(b) in return for his testimony at Mr. Baranski's trial, and further finds that the Government did not deliberately withhold information concerning an alleged promise to Carmi for a Rule 35(b) reduction or coach him to falsely deny that such a

promise was made. It is certain Carmi never received a Rule 35 sentence reduction. At Mr. Baranski's trial and at the evidentiary hearing, Carmi consistently testified that the Government never promised him a further sentence reduction. AUSAs Martin and Poehling testified credibly that no promise of a Rule 35 sentence reduction was made to Carmi. There is no written evidence from anyone at the U.S. Attorney's Office of a Rule 35 promise, and as discussed below it does not appear that Carmi met the requirements for a Rule 35 reduction for his trial testimony against Mr. Baranski.

The evidence does indicate there was some discussion between AUSA Poehling and Carmi's attorneys regarding the possibility of a Rule 35 reduction. The primary evidence regarding the possibility of a Rule 35 sentence reduction relates to Carmi's attorney John Rogers' understanding of verbal communications between himself and AUSA Poehling. Rogers testified in his deposition that AUSA Poehling made a verbal promise to his client for a further reduction, but that interpretation of their communications is not supported by the record. The Court also notes that because Rogers was not present to testify at the evidentiary hearing, it is impossible to evaluate his credibility.

Several factors support the conclusion that no Rule 35 promise was made. First, Carmi received a 5K1.1 reduction in his sentence for cooperating in Mr. Baranski's prosecution, which the Court finds implicitly included the expectation that Carmi would continue to cooperate by testifying against Mr. Baranski at his trial. AUSA Poehling testified that Carmi was expected to continue to cooperate, including by testifying at Mr. Baranski's trial. Carmi's former attorney Rosenblum, a very experienced criminal defense attorney, testified that "almost every plea agreement . . . contemplates continuing cooperation" "as to a particular case that [the defendant is] receiving a reduction [for]," and "I think in standard plea agreements in this district, when you receive a 5K1,

it contemplates that the individual is agreeing to cooperate, and the cooperation will be continuing vis-a-vis that case." (Rosenblum Dep., Gov't Ex. P, 41:17-42:4.) This type of continued cooperation is consistent with the Court's experience with criminal prosecutions in this district. Also, there was no mention of a Rule 35 sentence reduction in Carmi's plea agreement, which the Court believes should have been included had the Government made a promise to Carmi for a Rule 35 reduction, and Carmi specifically testified in his change of plea hearing that no other promises were made to him.

While Carmi's sentencing judge, Judge Webber, made reference during the sentencing to an off-the-record discussion in chambers about the *possibility* of a further reduction in Carmi's sentence, there is no indication there was a *promise* for a Rule 35 reduction in exchange for Carmi's testimony *against Mr. Baranski*. AUSA Poehling, the only witness who testified in person at the evidentiary hearing about this part of the sentencing hearing – other than Carmi who was not present during the in-chambers discussion – testified credibly that Judge Webber was referring to additional cooperation Carmi might proffer beyond the Baranski matter involving other subjects or other criminal activity. Carmi testified he did not hear Judge Webber make the statement about a Rule 35 reduction at his sentencing hearing, and did not realize what had been said at the hearing until he read the transcript years later. Because he did not hear Judge Webber's statement, Carmi could not have believed he had a promise of a Rule 35 sentence reduction based on the sentencing hearing when he testified against Mr. Baranski.

Second, under the version of Federal Rule of Criminal Procedure 35 in effect at the time of Mr. Baranski's trial in November 2002, Carmi was not eligible for a further reduction based on his trial testimony. At the time of Mr. Baranski's trial, a defendant could only receive a Rule 35 reduction for "subsequent substantial assistance in investigating or prosecuting another person"

provided to the government under two circumstances: (1) if the Government filed a motion on the defendant's behalf *within one year* after the defendant's sentencing, or (2) if the defendant provided the Government substantial assistance involving "information or evidence *not known* by the defendant until one year or more after sentence is imposed." Fed. R. Crim. P. 35(b) (emphasis added).

Here, Carmi's testimony at Mr. Baranski's trial occurred more than one year after his sentencing proceeding. Carmi's attorneys did not contact AUSA Martin to request that the Government file a Rule 35 motion prior to Mr. Baranski's trial, i.e., within the one-year limit, and no such motion was filed.[9] Carmi could therefore have only received a Rule 35 for his trial testimony by providing information or evidence *not known by him* until more than a year after sentence was imposed. It is clear Carmi's trial testimony against Mr. Baranski did not provide information or evidence that Carmi did not know until more than a year after he was sentenced.

"[I]f a defendant has already received a reduction of sentence under U.S.S.G. § 5K1.1 for substantial pre-sentencing assistance, he or she may not have that assistance counted again in a post-sentence Rule 35(b) motion." Rule 35, Fed. R. Crim. P., Advisory Committee Comments to 1998 Amendments. Here, Carmi had already received a § 5K1.1 reduction for his cooperation against Mr. Baranski, which was expected to include testimony at Mr. Baranski's trial. Thus, under the then-existing version of Rule 35, the Government could not have moved for a Rule 35(b) sentencing reduction for Carmi following his testimony at Mr. Baranski's trial, and the Court could not have granted such a motion.

---

[9]The Advisory Committee Comments to the 1991 Amendments to Rule 35 note that while the government must make a motion to reduce sentence before one year had elapsed, it did not require the court to rule on the motion within the one-year limit.

As Mr. Baranski observes, Rule 35(b) was amended effective December 1, 2002, and the amendment authorized government motions to reduce sentence more than one year after sentencing if a defendant's substantial assistance involved:

(A) information not known to the defendant until one year or more after sentencing;

(B) information provided by the defendant to the government within one year of sentencing, but which did not become useful to the government until more than one year after sentencing; or

(C) information the usefulness of which could not reasonably have been anticipated by the defendant until more than one year after sentencing and which was promptly provided to the government after its usefulness was reasonably apparent to the defendant.

Rule 35(b)(2)(A)-(C), effective Dec. 1, 2002.

Mr. Baranski contends that Carmi's trial testimony was eligible for sentence reduction under Rule 35(b)(2)(B), as Carmi provided information within one year of his sentencing but it did not become useful to the Government until more than one year after sentencing, i.e., the time of trial. Mr. Baranski does not cite any legal authority in support of his argument, and the Court does not find it persuasive. The Advisory Committee gives an example of Rule 35(b)(2)(B)'s application as "when the government starts an investigation to which the information is pertinent." Rule 35, Fed. R. Crim. P., Advisory Committee Comments to 2002 Amendments. Clearly, this example contemplates a new investigation, as opposed to Carmi's continued cooperation with respect to Mr. Baranski's case.

Although the Committee's example is not the only possible circumstance where information provided within one year of sentencing would not become useful to the government until after one year has passed, the Committee also explained that the amendment "would not eliminate the one-year requirement as a generally operative element." Id. The amendment was intended to apply

where the "*usefulness of the information is not reasonably apparent until a year or more after sentencing*," or if the information was "previously provided, for the government to seek to reward the defendant *when its relevance and substantiality becomes evident*." Id. (emphases added; parenthesis omitted).

In the absence of any case law or other authority to support Mr. Baranski's contention, the Court is not persuaded that the relevance and substantiality of Carmi's testimony was not "reasonably apparent" or "useful" to the Government until it was actually given, particularly where Carmi was interviewed numerous times by ATF agents as they investigated Mr. Baranski's case. The Court therefore does not believe that a Rule 35(b)(2)(B) reduction was available to Carmi when it became effective in December 2002 following his trial testimony.

Further, assuming for purposes of argument that Carmi was eligible for a sentence reduction under Rule 35(b)(2)(B), if the Government had actually promised Carmi a Rule 35 reduction in return for his testimony, the Court believes Carmi's attorneys would have asked the Government to file a Rule 35 motion within the one-year period rather than wait for a post-trial motion under the 2002 Amendment, which Congress could have declined to adopt after the one-year period expired and Carmi gave his testimony.

Third, the evidence does not support Mr. Baranski's assertion that there was a promise made to Carmi for a Rule 35 reduction. AUSA Poehling testified credibly that he never promised Carmi's attorneys, either Rogers or Rosenblum, that he would file a Rule 35 motion on behalf of Carmi because Carmi had already been promised the 5K1.1 motion for cooperating with respect to Mr. Baranski. Knowing that receiving sentence reductions pursuant to both a 5K1.1 motion and a Rule 35 motion is not usual, Carmi's attorneys never requested or received anything in writing from the Government regarding this alleged promise. There is no evidence authored by anyone with the

United States Attorney's Office regarding the alleged promise of a Rule 35 motion. Carmi and his attorneys may have hoped for a Rule 35 reduction, and as discussed above, AUSA Poehling discussed the possibility with at least Rogers, but the Court finds there was no promise.

The Court does not find Rogers and Rosenblum's correspondence to Carmi concerning the future filing of a Rule 35 motion to be persuasive evidence of the existence of such a promise, and notes that none of the letters mentions the Baranski case or Carmi's future testimony at his trial.[10] The Court also notes that Rosenblum testified in his deposition that Rogers was the lead attorney on Carmi's case and that Rosenblum had not reviewed the file in over ten years. Rosenblum's testimony did not exhibit a particular recall of the facts of the case or of the alleged promise by AUSA Poehling for a Rule 35 reduction.[11] Rosenblum was not present at Carmi's sentencing before Judge Webber and testified he had no understanding of the discussion that took placed in Judge Webber's chambers. Rogers' deposition testimony concerning alleged conversations that happened ten years prior is also not strong evidence, particularly where the Court was unable to observe Rogers' demeanor and ability to recall facts in live testimony.

Fourth, the evidence is that Carmi knew he would not receive a reduction in sentence under Rule 35 at the time he testified at Mr. Baranski's 2002 trial. AUSA Martin made it very clear to Carmi before he testified that he was not getting anything in return for testifying against Mr.

---

[10]The Court gives little to no weight or credence to the various statements contained in Carmi's voluminous correspondence to his attorneys, AUSA Martin and the Court, none of which were signed under penalty of perjury. This includes but is not limited to Carmi's assertions that John Rogers told him his sentence would be reduced to 18 to 24 months or that he would receive an additional 18 to 24 month reduction. Rogers, an experienced criminal defense attorney, testified he would never represent or promise a particular range or estimate for a further reduction. (Rogers Dep., Gov't Ex. O, 20:11-18.)

[11]Rosenblum often responded to deposition questions about Carmi's case by saying, "Ask Mr. Rogers." (Rosenblum Dep., Gov't Ex. P, 15:18-16:2, 16:12-15, 20:23-25, 27:5-7.)

Baranski.  Carmi never told AUSA Martin that he believed he had been promised or was going to

get a further sentence reduction under Rule 35.  Carmi also never told his attorneys that the United

States Attorney's Office was telling him that he was not going to get a sentence reduction in return

for testifying against Mr. Baranski.  Assuming AUSA Poehling stated at one time that Carmi could

be considered for a Rule 35 motion, Carmi knew as a result of AUSA Martin's unequivocal

statements before Mr. Baranski's trial that any possibility of a Rule 35 sentence reduction in return

for his testimony no longer existed.

There is no evidence that Carmi committed perjury at Mr. Baranski's trial when he testified

he did not have a deal for a Rule 35 sentence reduction in return for his testimony, or that the

Government knew or should have known of any alleged perjury on that issue.  See, e.g., Koehler v.

Wetzel, 2015 WL 2344932, at *23-24 (M.D. Pa. May 14, 2015) (finding because a witness believed

that any non-prosecution agreement had been revoked prior to his testimony at trial, there was no

exculpatory or impeaching evidence in the form of a non-prosecution agreement that the prosecutor

had a duty to disclose).

After AUSA Poehling was recused from the Baranski case, there was no communication

between AUSA Martin, who took over the case, and Carmi's attorneys.  Specifically, there was no

pretrial communication from Carmi's attorneys related to a further sentence reduction even though

Rule 35's then-existing one-year deadline was quickly approaching.  AUSA Martin testified that

neither Rogers nor Rosenblum contacted him before Mr. Baranski's trial or before the one-year

deadline requesting that the Government file a Rule 35 motion.  Further, Carmi's counsel did not

attend any pretrial preparation sessions with Carmi and the Government before Mr. Baranski's trial.

Fifth, the communication from Carmi's attorney Rogers to AUSA Martin after Mr.

Baranski's trial indicates that Rogers did not believe a promise for a Rule 35 reduction had been

made to Carmi, as Rogers never expressed to AUSA Martin that he believed Carmi was entitled to a further reduction. After Mr. Baranski's trial, when AUSA Martin first learned about Carmi's request for a Rule 35 sentence reduction, he promptly investigated whether AUSA Poehling had ever promised Carmi any further reduction and determined that no such promise was made. AUSA Martin then promptly sent a letter to Rogers which stated in part, "According to <u>both you and Dick</u> [Poehling], there was no promise from the Government to file a Rule 35 motion. Rather, Dick told you he would leave open the possibility of such a motion."[12] (Gov't Ex. A at 1) (emphasis added). In other words, after talking with both AUSA Poehling and Rogers, AUSA Martin determined there was no promise to Carmi of a Rule 35 sentence reduction in return for his testimony. There is no evidence Rogers disputed this statement made by AUSA Martin in his letter.

In addition, on January 9, 2003, AUSA Martin sent Carmi's counsel Rogers a second letter that stated,

> As a follow-up to my letter of December 2, 2002, and our telephone conversation of yesterday, please notify me as soon as possible in writing if you believe that Dick Poehling made any promise, expressed or implied, to your client that he would get a Rule 35 motion for his testimony in the Baranski trial. While everything set forth in my December 2, 2002 letter still holds true, given Mr. Carmi's testimony regarding this issue, I may need to notify the Court and opposing counsel if you believe there was such a promise.

(Gov't Ex. B.) AUSA Martin testified he wrote the second letter "to be able to ensure that they were not claiming that there had been a promise made by Dick Poehling . . . . And if there had been a promise made, I felt that we would likely have to take that to the Court because it was contrary to

---

[12]Contrary to Rogers' letter to Carmi dated February 17, 2003 that was introduced into evidence at the hearing, AUSA Martin never represented that he believed Carmi lied at Mr. Baranski's trial.

what Mr. Carmi had testified at the trial; and, therefore, Mr. Baranski and the Court would need to know about that." Rogers received AUSA Martin's January 9th letter, but he never responded.

Sixth, Carmi's counsel never filed anything with the Court requesting that the Government file a Rule 35 motion or otherwise pursue their understanding of discussions they had with AUSA Poehling.

There has been no convincing evidence offered to show that prior to Mr. Baranski's trial Carmi or the Government believed Carmi had a promise the Government would file a Rule 35 motion in return for his trial testimony. Similarly, there is no evidence to suggest AUSA Martin ever told Carmi or implied to Carmi that he should deny he had a promise for a Rule 35 motion. There is abundant evidence to the contrary on both these points, and the two letters from AUSA Martin to Rogers demonstrate the opposite. Thus, there can be no fundamental constitutional error.

In addition, before Mr. Baranski's trial, he and his counsel knew about the potential issue of a Rule 35 motion, and cross-examined Carmi about it at trial. Mr. Baranski called a witness at trial, Matuszny, who testified that he spoke to Carmi about a Rule 35 promise. Matuszny testified that Carmi said he was going to *ask for* a Rule 35 sentence reduction, not that he was promised one. Thus, the issue of a possible Rule 35 sentence reduction for Carmi was before the jury for its consideration.

The jury that found Mr. Baranski guilty heard Carmi testify his sentence was cut in half for agreeing to cooperate against Mr. Baranski. There was no evidence presented at the evidentiary hearing in this matter sufficient to establish that the Government promised Carmi a further Rule 35 sentence reduction in return for his testimony. Because the jury heard Mr. Baranski's attorney put forth evidence that Carmi was going to request a further reduction in his sentence, the jury could have believed that evidence yet still found Mr. Baranski guilty after hearing all of the evidence. It

cannot be considered fundamental constitutional error when the jury had an opportunity to consider the very issue Mr. Baranski alleges in his Petition. For these reasons, Mr. Baranski has failed to show the likelihood of a different result great enough to undermine confidence in the outcome of the trial.

Finally, the Court takes judicial notice of and has reviewed the entire trial transcript of Mr. Baranski's criminal trial. Although Carmi was the most significant witness against Mr. Baranski, the Court's earlier comments in this proceeding that the entire case rested on Carmi's testimony were overstated, and were based in part on a then-required reading of the Petition in the light most favorable to Mr. Baranski.

Unlike in the recent Supreme Court case <u>Wearry v. Cain</u>, offered by petitioner as supplemental authority, the Government's evidence at Mr. Baranski's criminal trial did not "resemble[] a house of cards" built on Carmi's testimony. <u>Id.</u>, 132 S. Ct. at 1006. At trial, there was corroborated evidence and testimony, including Mr. Baranski's own personal communications to Carmi, concerning the criminal scheme charged in the case. (Trial Exs. 2, 3, 5, 7.) For example, Mr. Baranski prepared Form 6 applications stating he needed five of each weapon in order to have sales samples for each of his salesmen, but sent a fax to Carmi which indicated that he intended to sell Carmi all of his dealer samples. (Tr. Ex. 3.)[13] ATF witness Mary Jo Hughes testified concerning the false Form 6 applications Mr. Baranski submitted to ATF attempting to import hundreds of high-caliber machine guns and weapons from foreign countries for demonstration to a three-person municipal police department in Farber, Missouri (Trial Tr. Vol. III, 3:10-36:15); Robert

---

[13]The fax from Mr. Baranski to Carmi stated in pertinent part, "Remember, I'll get the weapons directly to me, then we'll simply transfer them to you (my dealer samples.)" (Tr. Ex. 3 at 2.)

Douglas Patterson, former marshal for the Village of Jemez Springs, New Mexico, testified regarding the falsity of one of the law enforcement letters Mr. Baranski submitted to ATF from Patterson's two-man police department for a town of 484 people requesting a demonstration of 76 machine guns (id., 36:20-40:25); and former Farber, Missouri Police Chief and co-conspirator Jeff Knipp testified concerning the criminal scheme and conspiracy (id., 41:11-64:16).

These witnesses' testimony provided additional support for Carmi's testimony that Mr. Baranski knew of the fraudulent nature of the law enforcement letters. Cf. Willis v. United States, 87 F.3d 1004, 1006-07 (8th Cir. 1996) (§ 2255 movant's claim that key issue of his intent to defraud turned entirely on his and the government's principal witness' testimony was belied by other evidence of defendant's knowledge of and participation in the fraud; defendant was not prejudiced by defense counsel's failure to conduct an adequate investigation of the witness' plea agreement where other testimony and evidence supported the witness' testimony concerning defendant's knowledge of and participation in the fraud).

In addition, ATF Special Agent Michael Johnson testified about the criminal scheme, including the January 18, 2001 interview with Mr. Baranski in Ohio, during which Mr. Baranski lied to Agent Johnson (id., 65:18-123:6). Significantly, Mr. Baranski himself testified. In his testimony at trial and at the evidentiary hearing, Mr. Baranski admitted he lied to Agent Johnson during the January 2001 interview about having met former Police Chief Knipp, about meeting Knipp at Carmi's house, and about having several telephone conversations with Knipp, none of which occurred. (Trial Tr. Vol. IV, 156:18-157:19, 158:19-159:12; Baranski Dep., Gov't Ex. D, 250:3-251:5; Tr. Vol I, 183:5-184:4.) Mr. Baranski testified he lied to Agent Johnson even though at the time he thought Johnson was a compliance officer there to help him rather than a law enforcement officer. (Trial Tr. Vol IV, 157:22-158:13.) Mr. Baranski also testified that once he

knew Agent Johnson was a law enforcement officer, he lied that Carmi had nothing to do with Mr. Baranski getting the law enforcement letter from Knipp.  (Id., 166:4-24.)  "An effort to deceive in order to distance oneself from wrongdoing implies a consciousness of guilt and is clearly a circumstance supporting a conviction."  United States v. Sloan, 293 F.3d 1066, 1068 (8th Cir. 2002).

At Mr. Baranski's criminal trial, his attorneys extensively cross-examined Carmi about a number of credibility issues.  The cross examination issues for the jury included Carmi's mental health and memory loss, the charges Carmi pleaded guilty to, his sentencing exposure, promises the Government made to Carmi (i.e., the 5K1.1 sentence reduction) and the benefits he received, and the possibility of Carmi receiving a motion pursuant to Rule 35.  This placed all of the issues related to Carmi as contained in Count I of Mr. Baranski's Petition before the jury for its assessment as it evaluated Carmi's testimony.  The jury was able to hear the testimony and assess the witness' credibility, and no fundamental Constitutional error exists in that process.

As Mr. Baranski asserts, the reasoning of Napue v. Illinois, 360 U.S. 264 (1959), has been extended to the Brady context, both by the Supreme Court and the Eighth Circuit.  In Banks v. Dretke, 540 U.S. 668 (2004), the Supreme Court rejected the state's argument that no Brady violation occurred because the witness was "heavily impeached at trial," thus rendering his status as a paid informant "merely cumulative."  Id. at 702 (alterations omitted).  The Supreme Court found that no other impeachment evidence was "directly relevant" to the witness's status as an informant, and held that "one could not plausibly deny the existence of the requisite 'reasonable probability of a different result' had the suppressed information been disclosed to the defense."  Id. at 702-03.  See also Reutter, 888 F.2d at 581 ("The state argues that because Trygstad was a convicted felon his credibility already was suspect and the additional information regarding his petition for commutation

and pending hearing thereon would not have affected the jury's judgment as to his truthfulness. Logic of this kind has been dismissed by the Supreme Court." (citing <u>Napue</u>, 360 U.S. at 270)).

Here, although Mr. Baranski complains that numerous additional documents relating to Carmi's mental condition and memory loss were not provided by the Government to his attorneys, none of the documents he identifies would have opened a new line of impeachment or provided a different avenue of impeachment. Other impeachment evidence that was provided by the Government to Mr. Baranski's attorneys was directly relevant to Carmi's mental condition and memory loss. <u>Cf.</u> <u>Banks</u>, 540 U.S. at 702. The documents Mr. Baranski complains were not provided, even if not entirely cumulative, do not establish the existence of the requisite "reasonable probability of a different result" had the suppressed information been disclosed to the defense, such that confidence in the verdict is undermined.

Mr. Baranski also contends the Government violated <u>Brady</u> when it failed to provide his attorneys a copy of Carmi's sentencing transcript, and falsely informed them it was available from the court reporter even though it was actually filed under seal. The evidence, however, is that AUSA Martin did not have a copy of the sentencing transcript until after Mr. Baranski's trial, and informed defense counsel the transcript could be obtained from the court reporter. The fact that AUSA Martin incorrectly told defense counsel the transcript was publicly available is irrelevant, as defense counsel could have made inquiry of the court reporter or the Clerk's Office, learned the transcript was under seal, and then filed a motion to lift the seal. They did not do so, however. "Due process does not require the prosecution to turn over its entire file or to do the defense counsel's work." <u>United States v. Willis</u>, 997 F.2d 407, 412-13 (8th Cir. 1993). The Court specifically finds AUSA Martin's testimony that he did not have a copy of the transcript credible, and therefore

discounts the testimony of Mr. Baranski's former attorney that AUSA Martin represented there was nothing exculpatory in the transcript.[14]

For all of these reasons, the Court concludes Mr. Baranski has failed to present sufficient evidence to prevail on his claims in Count I.

D. The Government Did Not Deliberately Withhold Records Concerning Carmi's Amnesia and Memory Loss or Coach Carmi to Commit Perjury Regarding His Alleged Brain Damage and Memory Loss

In Count II, Mr. Baranski asserts that "the Government was fully aware of the extent of Carmi's memory impairment, and deliberately withheld records supporting Carmi's amnesia and memory loss," "prepared Carmi for Baranski's trial by coaching him to downplay his memory impairment," and "spoon fed Carmi with information purported to be the past factual events that he could not remember[.]" (Third Amended Verified Petition, Doc. 187, ¶¶ 83-93.)

At Mr. Baranski's criminal trial, however, Carmi testified extensively regarding his alleged memory loss issues. In addition, Mr. Baranski's investigator testified at the trial that he met with Carmi and Carmi told the investigator he had memory issues. The evidence shows that Carmi testified truthfully and accurately regarding his mental state at the time of Mr. Baranski's trial. The Court finds there was no credible evidence presented at the evidentiary hearing to suggest that the Government instructed Carmi to minimize or otherwise misrepresent his brain damage or memory loss when he testified against Mr. Baranski, or that the Government spoon fed Carmi factual information that he could not remember.

---

[14]The Court also finds AUSA Martin's incorrect statement to Mr. Baranski's defense attorney that the transcript was publicly available tends to support Martin's testimony that he did not have a copy of the transcript.

With respect to the claim that the Government deliberately withheld records, Mr. Baranski and his counsel testified at the evidentiary hearing that they knew about Carmi's medical, mental health, and alleged memory loss issues. Specifically, Mr. Baranski and his counsel knew that Carmi had experienced a serious head injury before trial, had been in a coma for days and at one point was not expected to live, that Carmi claimed to have memory impairment or memory loss as a result of the head injury, and had been diagnosed as a malingerer. Mr. Baranski had first-hand knowledge of Carmi's mental health condition because he personally interacted with Carmi both before and after his accident. Before trial, Mr. Baranski's attorneys were provided or obtained medical records concerning Carmi's mental and physical health from the Springfield Federal Medical Center, the Rochester Federal Medical Center in Minnesota, and St. Anthony's Hospital where Carmi was privately treated. In addition, Mr. Baranski's defense team hired a private investigator who talked with Carmi before Mr. Baranski's trial and Carmi told the investigator he had memory problems.

Further, prior to his trial, Mr. Baranski and his counsel knew that Carmi had been psychologically and medically examined by the Court and they received a copy of the Springfield Forensic Report that described Carmi's medical and psychological history. The treating physicians prepared an extensive report that detailed Carmi's medical, mental and psychological conditions and concluded that Carmi was malingering. This comprehensive forensic report also clearly documented Carmi's statements about his memory loss issues. Again, at Mr. Baranski's trial, Carmi testified both about his claims of memory impairment and mental health issues, and that he was diagnosed as a malingerer. When asked at the evidentiary hearing if he agreed with the finding in the Springfield Forensic Report, Carmi testified, "Yeah. I was faking."

Mr. Baranski offered numerous medical records from the BOP at the evidentiary hearing and claims the Government should have provided these documents prior to his trial even though the

documents contain largely similar information as documented in the Springfield Forensic Report. (See Pet.'s Ex. 38 ("involved in a car accident and suffered head trauma"), Ex. 39 ("Still feels "in a fog," poor memory."), Ex. 40 ("memory problems"), Ex. 41 ("brain damage from accident, head injury"), Ex. 42 ("He continues to repeat retrograde and anterograde amnesia in relation to a motorcycle accident that occurred in May 2000"), Ex. 43 ("He's alleged to have suffered some brain damage and has difficulty with recent and remote memory"), Ex. 44 ("memory problems"), Ex. 46 ("memory and speech problems"), Ex. 47 ("I had a head injury and have trouble with memory."), Ex. 48 ("We discussed his accident and the long-term effects of his head injury."), Ex. 53 ("difficulty with memory"), Exhibit 54 ("He says he has episodes of not knowing where he is and can't remember things"). The Court notes that some of these documents record statements by Carmi himself, as opposed to medical diagnoses or medical findings.

Mr. Baranski introduced several of these exhibits at the evidentiary hearing, asking his former attorney Gardiner how he would have used each at trial had they been produced. Gardiner responded generally that he would have used each document to cross-examine Carmi concerning his memory. (Tr. Vol. I, 28:4-35:8.) For example, Mr. Baranski introduced Petitioner's Exhibit 40, a medical intake screening record from the BOP dated January 17, 2002. (Tr. Vol. I, 29:3-14.) Gardiner read a portion of this document into the record: "On the psychology services inmate questionnaire, Mr. Carmi indicated he has been experiencing anxiety, memory problems, dizziness, relationship problems, concentration problems and severe headaches." (Id., 29:15-18.) Gardiner testified that this information was not conveyed to him before Mr. Baranski's trial, (id., 29:19-21), and he would have cross-examined Carmi at Mr. Baranski's trial about his memory problems. (Id., 29:22-30:1.) Gardiner admitted, however, that he had a copy of the Springfield Forensic Report prior to trial. (Tr. Vol. I, 74:2-76:19.) At numerous places in the Springfield Forensic Report are

mentions of the same or similar statements concerning Carmi's motorcycle accident, brain injury and his alleged memory loss. More importantly, Mr. Baranski's attorney cross-examined Carmi at trial regarding his "severe memory loss," referencing the Springfield Forensic Report, and elicited from Carmi the admission that it was "probably true" he had "both memory loss problems and [he] lie[d] to doctors."[15] (Trial Tr. Vol II, 47:18-48:17.)

As discussed above with respect to Count I, the records Mr. Baranski claims were not released to him do not open any new avenues of impeachment, and are similar to and largely cumulative of the information that was available to Mr. Baranski's defense team before trial. See, e.g., Rivera v. United States, 494 F.Supp.2d 383, 387 (E.D. Va. 2007) (where defendant received the essential information contained in the documents at issue, it was not a Brady violation that the specific documents were not produced); see also Burton v. Dormire, 295 F.3d 839, 847 (8th Cir. 2002) (evidence of a second plea agreement was purely cumulative for impeachment purposes; "when the [state] does not disclose a potential source of evidence but the evidence available from that source is cumulative of evidence already available to the defendant, it has committed no Brady violation.") (quoted case omitted). Mr. Baranski and his legal team were able to cross-examine Carmi as to his mental condition and memory loss with the Springfield Forensic Report, and could

---

[15]Moreover, there is no evidence to suggest that the United States Attorney's Office had a copy of Exhibit 40 (and many other BOP records that Mr. Baranski introduced as exhibits) prior to Mr. Baranski's trial. The evidence suggests to the contrary. For example, at the bottom of Petitioner's Exhibit 40 is a reference to the date "12/11/2009." (See Pet.'s Exs. 40, 12, 42 and 48.) In 2009, Carmi was charged in a different federal criminal case by the United States Attorney's Office. It is likely these records were obtained by the United States Attorney's office in relation to the 2009 Carmi case, seven years after Mr. Baranski's trial, and therefore would have been impossible to produce to Mr. Baranski's attorneys in 2002. In addition, while Mr. Baranski's attorneys knew that BOP records existed regarding Carmi, they did not subpoena the records or take any additional steps to obtain them, and did not investigate the matter further. See Willis, 997 F.2d at 413 ("Due process does not require the prosecution to turn over its entire file or to do the defense counsel's work.").

have also cross-examined Carmi with the medical records they had from the Rochester Federal Medical Center and St. Anthony's Hospital, but chose not to do so.

Mr. Baranski points to a sixteen-page letter his attorneys wrote to AUSA Martin containing numerous discovery requests, including for "a complete copy of the mental and physical health (medical) records which are in the possession or within the control of the U.S. Department of Justice, Federal Bureau of Prisons." (Letter from Robert E. Sanders to AUSA Martin (Aug. 14, 2002), Gov't Ex. H at 11.)[16] AUSA Martin responded to Mr. Baranski's counsel that he would not provide those documents "unless you have caselaw which supports your request." Gov't Ex. J. Mr. Baranski and his attorneys do not dispute that they never sought records directly from the BOP despite knowing of the existence of such records. Before his criminal trial, Mr. Baranski sought to have Carmi's medical file from the federal prison produced by the USAO, but Magistrate Judge Medler issued a lengthy Order denying the request. (Order and Report and Recommendation, No. 4:02-CR-361 CAS, Doc. 54.) Mr. Baranski could have appealed this ruling but failed to do so, and as a result its assertion in this matter is abuse of the writ.[17]

The Court also rejects Mr. Baranski's assertion that the USAO had a duty to provide the BOP information not in its possession under Kyles, 514 U.S. at 437, and United States v. Lacey, 219 F.3d

---

[16]Government Exhibit H was not admitted at the evidentiary hearing, but the Court considers it as Mr. Baranski cited to it in his post-hearing brief and it was included as an exhibit with the Government's previously filed Motion for Summary Judgment.

[17]The abuse of the writ doctrine is more fully discussed *infra* at 70-71. The Court also notes that in the August 2002 letter from Sanders to AUSA Martin, Mr. Baranski's counsel referred to the Springfield Forensic Report and stated "there is considerable evidence that James Carmi suffered a severe head injury in a motorcycle accident in May of 2000." He also noted the report stated that "Mr. Carmi's head injury has resulted in amnesia, poor memory, and inability to handle ordinary demands of his everyday life." (Gov't Ex. H at 11.) This shows Mr. Baranski's defense team were aware of the extent of Carmi's injury and memory loss prior to the trial.

779 (8th Cir. 2000). Neither case contemplates the obligations Mr. Baranski asserts are required. The Supreme Court stated in <u>Kyles</u> that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." <u>Kyles</u>, 514 U.S. at 437. Information the police have about a defendant's criminal investigation is significantly different than medical records from a completely separate government entity treating a witness in a case. The BOP medical providers who treated Carmi were not acting on the Government's behalf in prosecuting Mr. Baranski. The assertion that a prosecutor would be required to seek information from any government agency that interacted with or had information about a witness goes well beyond what <u>Kyles</u> requires. Similarly, the Eighth Circuit Court in <u>Lacey</u> does not contemplate the USAO having a duty to obtain and produce BOP medical records concerning Carmi simply because they knew such medical records existed. Further, as stated above, Mr. Baranski and his attorneys knew Carmi's medical records existed and could have subpoenaed the BOP, but failed to do so. <u>See</u> <u>United States v. Roy</u>, 781 F.3d 416, 421 (8th Cir. 2015) ("The government does not suppress evidence in violation of <u>Brady</u> by failing to disclose evidence to which the defendant had access through other channels.") (quoted case omitted).

The Court concludes that Mr. Baranski's claims regarding the Government's alleged failure to produce records regarding Carmi's mental health issues including amnesia and memory loss do not rise to the level of a fundamental constitutional error meriting *coram nobis* relief. Based on the same reasoning as discussed above with respect to Count I, Mr. Baranski's defense team was provided with significant impeachment evidence concerning Carmi's mental state and memory loss issues. In addition, the other evidence presented at Mr. Baranski's trial, as detailed above, was sufficient to convict Mr. Baranski beyond a reasonable doubt. The Court concludes that Mr. Baranski has failed to present sufficient evidence to establish the existence of the requisite

"reasonable probability of a different result" had the allegedly suppressed information been disclosed to the defense. For these reasons, the Court concludes Mr. Baranski has failed to present sufficient evidence to prevail on his claims in Count II.

E. The Government Did Not Mislead the Court or Mr. Baranski's Defense Team Concerning Carmi's Sentencing Exposure

In Count III, Mr. Baranski alleges that the Government misled the Court and his defense team about the extent and length of Carmi's incarceration exposure. (Third Verified Amended Petition, Doc. 187, ¶¶ 94-103). Specifically, Mr. Baranski claims the Government made a deal with Carmi that in exchange for his testimony against Mr. Baranski, the Government (1) would not seek a sentence in the Sentencing Guidelines range of 87 to 108 months, (2) would not seek a mandatory fifteen-year term against Carmi under the Armed Career Criminal Act, (3) would not prosecute Carmi for a number of additional criminal charges, and (4) permitted Carmi to keep various items of real and personal property that were the proceeds of illegal activity. (Third Verified Amended Petition, Doc. 187, ¶¶ 97-99.) Mr. Baranski presented no evidence in support of the third and fourth allegations and therefore the Court does not discuss them further.

At Mr. Baranski's criminal trial, Carmi testified that he believed his sentence exposure – based on the United States Sentencing Guidelines – was 76 to 86 months, and that he was sentenced to 42 months because of his cooperation. In fact, Judge Webber determined at Carmi's sentencing that Carmi was facing a range of 78 to 97 months because his total offense level was 26, with a criminal history category of 3. While the upper end of the sentencing range was actually eleven months longer than Carmi testified, and this error was not corrected by the Government, there is no

indication the error was intentional or significant.[18]  Further, while Mr. Baranski attempts to make much of the fact that the PSR originally stated Carmi's sentencing guideline range was 87 to 108 months, Judge Webber determined that the PSR was in error and Carmi's correct sentencing range was 78 to 97 months.

Pursuant to the Plea Agreement, Carmi pleaded guilty to Count I (False Statements to Acquire Firearms) and Count II (Money Laundering), and the Government agreed "that no further federal prosecution will be brought in this District relative to the Defendant's Acquisition and Distribution of Firearms, of which the Government is aware at this time, from October, 1999 to the date of this agreement."  Mr. Baranski and his attorneys had a copy of the plea agreement prior to his trial.  As such, they were aware of the statutes under which Carmi was charged.  As experienced attorneys, Mr. Baranski's counsel were aware of the statutory range of punishment for the charged offenses, and any other crimes with which Carmi could have been charged.  In addition, Mr. Baranski's attorneys were familiar with and knew of the United States Sentencing Guidelines and how they applied to Carmi's circumstances.  Therefore, the evidence shows by the time of Mr. Baranski's trial, he and his attorneys knew what charges Carmi had pleaded guilty to, the potential length of sentence those charges carried, and the actual sentence that Carmi received.  Indeed, Mr. Baranski's attorney admitted at the evidentiary hearing that he cross-examined Carmi extensively about his sentence and the benefits Carmi got from the Government.

Mr. Baranski claims that Carmi could have been charged as an armed career criminal, but that he was not so charged due to an undisclosed agreement with the Government.  No evidence was presented at the evidentiary hearing to support this claim.  The evidence established that Carmi did

---

[18]As previously stated, the Court finds that AUSA Martin did not have a copy of Carmi's sentencing transcript until after the conclusion of Mr. Baranski's trial.

not qualify as an armed career criminal, which requires three or more qualifying prior felony convictions. Carmi could not have been charged as an armed career criminal because some of his prior felony convictions were not predicate convictions for the purpose of the Armed Career Criminal Act. Carmi did not qualify for the fifteen-year mandatory minimum sentence for an armed career criminal because although he had several convictions, only one was a qualifying prior felony conviction under the ACCA.

Mr. Baranski's defense counsel, Gardiner and Sanders, admitted they were familiar with how a defendant can be considered to be an armed career criminal. Mr. Baranski's defense counsel were aware of Carmi's past criminal history and of the United States Sentencing Guideline ranges. For these reasons, Mr. Baranski's defense counsel had all of the information they needed to determine whether Carmi could have been considered an armed career criminal prior to Mr. Baranski's trial, and could have cross-examined Carmi about it.

Mr. Baranski contends the USAO should have provided his defense counsel with a copy of Carmi's confidential PSR that was filed under seal, and that AUSA Martin misrepresented the PSR's contents by representing that it did not contain any Brady or Giglio material or anything favorable to Mr. Baranski. Under this Court's rules and procedures, the USAO could not have provided a copy of the sealed PSR to Mr. Baranski's attorneys, and in fact they filed a motion to obtain a copy of the PSR which Magistrate Judge Medler denied.

It is true that the Government may have an obligation to disclose information from a PSR that constitutes Brady or Giglio material even where the PSR itself cannot be disclosed. The Court has some concern about AUSA Martin's representation to Mr. Baranski's attorneys that there was no Brady or Giglio material in Carmi's PSR, as it contained the sentencing range Carmi faced, even though Judge Webber later determined the PSR's sentencing range was incorrect. However, "[T]he

application of <u>Brady</u> does not depend on the prosecutor's culpability for the non-disclosure, but rather on whether the non-disclosure deprived the defendant of a fair trial." <u>Robinson</u>, 809 F.3d at 1003 (J. Kelly, dissenting in part).

Mr. Baranski has not shown that the sentencing range as reflected in the PSR was so significant in the context of his criminal case – considering the information that was available to Mr. Baranski's attorneys about the charges against Carmi, his criminal history, the Sentencing Guidelines, the sentence Carmi actually received, and the cross-examination of Carmi that occurred at trial – that there is a reasonable probability that had the PSR's incorrect sentencing range been disclosed, the result of the proceeding would have been different, such that confidence in the outcome of the trial is undermined. The Court therefore concludes that Mr. Baranski failed to present sufficient evidence at the evidentiary hearing to prevail on Count III.

F. <u>Petitioner's Prosecutorial Misconduct and Vindictive Prosecution Claims are Without Merit or are Abuse of the Writ</u>

In Count V, Mr. Baranski alleges that AUSAs Poehling and Martin, and ATF agents involved in his criminal case:

> shared a common design and understanding, and/or common goal; and conspired, to conceal the promise of a Rule 35 motion for Carmi and records thereof; to conceal the severity of Carmi's head injury and memory loss and records thereof; to conceal Carmi's oral statements; to conceal Carmi's criminal history; conceal that Carmi was an Armed Career Criminal; to commit witness tampering; to coach and allow perjured testimony to be presented.

Third Amended Verified Petition at 27, ¶ 115. Mr. Baranski also alleges that the AUSAs misrepresented facts to his attorneys, coached Carmi to testify falsely, intimidated witnesses, and vindictively prosecuted Mr. Baranski because he refused to dismiss his then-pending <u>Bivens</u> action arising out of the seizure of his firearms from the bonded U.S. Customs Warehouse in which they were kept. <u>Id.</u>, ¶¶ 116-118.

In the Order that addressed the Government's motion to dismiss Mr. Baranski's Second Amended Petition, the Court concluded Mr. Baranski's prosecutorial misconduct and vindictive prosecution count was properly considered under the same analysis as the individual claims set forth in other counts, as the prosecutorial misconduct/vindictive prosecution count was based on the same factual allegations as the individual claims. See Mem. and Order of Oct. 7, 2014 at 28 (Doc. 177). The Court also concluded that certain of Mr. Baranski's claims were subject to dismissal as abuse of the writ or as a second and successive § 2255 claim. Id. As relevant to the prosecutorial misconduct and vindictive prosecution claims in Count X, the Court stated:

> The Court concludes that the omnibus prosecutorial misconduct and vindictive prosecution claims in Count X are properly considered under the same analysis as the individual claims set forth in the preceding counts, as the prosecutorial misconduct claims are based on the same factual allegations as the individual claims. Accordingly, the Court finds the claims in Count X are an abuse of the writ to the extent they are based on the allegations contained in Counts III, IV, VII and VIII, as those counts are abuse of the writ, and Count IX as that count is second or successive, but the claims in Count X are not an abuse of the writ to the extent they are based on Counts I, II, V and VI. The government's motion to dismiss for abuse of the writ will be granted in part and denied in part as to Count X.

Mem. and Order of Oct. 7, 2014 at 28. The Court also granted Mr. Baranski's motion for leave to file a third amended petition for writ of error coram nobis, but directed him to omit from it the claims that had been dismissed as abuse of the writ or as second and successive. Id. at 29-30.

The allegations in Counts I through IV of Mr. Baranski's Third Amended Petition correspond, respectively, to Counts I, II, V and VI of Mr. Baranski's Second Amended Petition. As Mr. Baranski has withdrawn Count IV, only Counts I, II, III and V remain.

Mr. Baranski's allegations of prosecutorial misconduct and vindictive prosecution based on the alleged concealing of a promise of a Rule 35 motion for Carmi, the severity of Carmi's head injury and memory loss, Carmi's oral statements, and Carmi's alleged status as an Armed Career

Criminal; and the Government's alleged coaching and allowing of perjured testimony by Carmi and misrepresenting facts to Mr. Baranski's attorneys, are without merit and fail for the same reasons discussed *supra* with respect to Counts I, II and III, and based on the Court's conclusion that Mr. Baranski has failed to establish he is entitled to the extraordinary relief of coram nobis on any of his underlying allegations.

The Court also concludes Mr. Baranski cannot establish that he is entitled to coram nobis relief for prosecutorial misconduct or vindictive prosecution based on AUSA Poehling's alleged statements that if Mr. Baranski did not dismiss his <u>Bivens</u> action, he would be indicted and sent to prison, and upon his release government agents would follow him around for the next twenty years. As stated above, the prosecutorial misconduct and vindictive prosecution allegations in Count V relate to the same facts as the underlying allegations in Counts I through IV. Nothing in Counts I through IV relate to alleged threats made by AUSA Poehling to Mr. Baranski, so the existence or non-existence of these threats have no bearing on what this Court has previously determined to be the scope of Count V.[19]

More fundamentally, the Court concludes that Mr. Baranski's allegations of prosecutorial misconduct and vindictive prosecution based on AUSA Poehling's alleged threats cannot be considered because they are barred as abuse of the writ. The abuse of the writ doctrine "in general prohibits subsequent habeas consideration of claims not raised, and thus defaulted, in the first federal habeas proceeding." <u>McCleskey v. Zant</u>, 499 U.S. 467, 490 (1991). The abuse of the writ doctrine applies to coram nobis cases. <u>Camacho-Bordes</u>, 94 F.3d at 1172-73.

---

[19]In addition, at the pretrial conference before the evidentiary hearing in this matter, the Court ruled that evidence of alleged threats made by AUSA Poehling to Mr. Baranski could be admitted only for purposes of impeachment. (Pretrial Conf. Tr., Doc. 289 at 31-32.)

"[T]he abuse-of-the-writ doctrine . . . concentrate[s] on a petitioner's acts to determine whether he has a legitimate excuse for failing to raise a claim at the appropriate time." McCleskey, 499 U.S. at 490. The Supreme Court held that the "cause" and "prejudice" standard used to determine whether to excuse state procedural defaults is the standard for determining whether there has been an abuse of the writ through inexcusable neglect. See id. at 490-96. Where a petitioner files a second or successive petition "the government bears the burden of pleading abuse of the writ" and does so "if, with clarity and particularity, it notes petitioner's prior writ history, identifies the claims that appear for the first time, and alleges that petitioner has abused the writ." Id. at 494. If this initial burden is met, it then shifts to the petitioner to disprove abuse. Id. To excuse his failure to raise a claim earlier, the petitioner "must show cause for failing to raise it and prejudice therefrom." Id.

Here, the Government met its burden to plead abuse of the writ in its motion to dismiss Mr. Baranski's Second Amended Petition. See Mem. and Order of Oct. 7, 2014 at 6-7. Because Mr. Baranski's allegations of prosecutorial misconduct and vindictive prosecution are based on an incident that occurred in his and his attorney's presence in March 2002, the allegations could have been raised at his criminal trial, on direct appeal, or in his first collateral attack of his conviction under 28 U.S.C. § 2255, but were not. The instant coram nobis proceeding is Mr. Baranski's second collateral attack of his conviction. There can be no cause for Mr. Baranski's failure to raise in his first federal habeas petition his claims of prosecutorial misconduct and vindictive prosecution based on AUSA Poehling's statements. As a result, these claims cannot be considered in this coram nobis case. See McCleskey, 499 U.S. at 490.

For these reasons, the Court concludes that Mr. Baranski failed to present sufficient evidence at the evidentiary hearing to prevail on his claims of prosecutorial misconduct and vindictive

prosecution in Count V to the extent they are based on the underlying claims in Counts I, II and III of the Petition, and that the remaining claims in Count V based on the alleged statements of AUSA Poehling are subject to dismissal as abuse of the writ.

## V. Conclusion

After carefully considering Mr. Baranski's allegations, the evidence presented at the evidentiary hearing, the evidence in rest of the record in this case, and the record in Mr. Baranski's underlying criminal case, the Court concludes for the reasons discussed herein that Mr. Baranski has failed to meet his burden to establish that he is entitled to the extraordinary relief of coram nobis. Mr. Baranski has not shown that the "likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" Smith, 132 S. Ct. at 630 (quoting Kyles, 514 U.S. at 434). The Court is satisfied that Mr. Baranski received a fair trial that resulted in a verdict worthy of confidence.

Accordingly,

**IT IS HEREBY ORDERED** that Counts I, II, III and V of petitioner Keith Byron Baranski's Third Verified Amended Petition for Writ of Error Coram Nobis are **DISMISSED**. [Doc. 187]

**IT IS FURTHER ORDERED** that Count IV of petitioner Keith Byron Baranski's Third Verified Amended Petition for Writ of Error Coram Nobis is **DISMISSED**, having been withdrawn.

**IT IS FURTHER ORDERED** that the United States of America's motion for summary judgment is **DENIED as moot**. [Doc. 237]

An appropriate Order of Dismissal will accompany this Memorandum and Order.

_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  31st  day of March, 2016.